PHI DELTA THETA FRATERNITY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10500-86. Filed May 16, 1988.

---

*Barbara Schwartz Bromberg,* for the petitioner.
*Ronald T. Jordan,* for the respondent.

GERBER, *Judge:* By statutory notice dated March 3, 1986, respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended June 30, 1979, in the amount of $37,068. The issue presented for our consideration is whether the net investment income from petitioner's Frank J.R. Mitchell Scroll Endowment Fund is subject to income tax as unrelated business income of an exempt organization.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner, the national office of a college men's fraternity, is a not-for-profit corporation exempt from Federal income tax under section 501(c)(7).[1] Petitioner was incorporated under the laws of the State of Ohio, and at the time the petition herein was filed, had its principal office at Oxford, Ohio.[2] The return for the period here involved was a Form 990-T, Exempt Organization Business Income Tax Return, timely filed with the office of the Internal Revenue Service at Cincinnati, Ohio.

Petitioner owns and maintains an endowment fund named the Frank J.R. Mitchell Scroll Endowment Fund (Scroll Fund). The regulations governing the Scroll Fund provide that petitioner may use the income therefrom as follows: first, for the payment of any necessary expenses incurred in the administration of the trust by the corporate trustees; second, for the payment of the necessary expenses of editing, printing, and publishing the periodical publications

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The fraternity was organized in 1848 and has operated continuously since then.

of the fraternity; and third, for the payment of any other necessary expenses of the fraternity under the laws of the fraternity as to the ordinary revenues.

Pursuant to the regulations governing the Scroll Fund, petitioner publishes a journal called the Scroll. This magazine, the official publication of the organization, is published, generally, 5 times a year, and has been published continuously since 1878.[3] Approximately 60,000 copies of each issue are distributed as follows: 53,000 to alumni, 5,000 to undergraduates, and 2,000 to libraries and universities. The expenses of publishing and distributing the Scroll are paid by the Scroll Fund.

In a readership survey conducted by petitioner on September 8, 1982, the editorial philosophy of the magazine was stated, generally speaking, as follows: (1) To provide readers with information on developments and issues within the fraternity; (2) to provide readers with information about the achievements of undergraduates and alumni; (3) to feature prominent alumni and their accomplishments; and (4) to provide readers with educational information about society and higher education.

The general content of the Scroll is as follows: (1) The "Busy Phis" section features an article on an alumnus who has achieved outstanding success in the business world. For example, the Summer 1978 issue carried a story on J. Willard Marriott and how he successfully moved from operating a root beer stand in Washington, D.C., to founding one of the world's largest corporations, the Marriott Corporation. J. Willard Marriott has been a member of petitioner's Utah chapter since 1925. This section also contains a short article on an outstanding alumnus who has received a distinguished award or made an outstanding achievement in the military or business sector. For example, the Summer 1978 issue featured Aloysius T. Hackenberg, a member of the North Dakota chapter since 1946, as "Phi of the Year." Hackenberg was named winner of the Raymond L. Gardner award as "Phi of the Year" for 1977. At that time, Hackenberg was an insurance executive with a major insurance company. Also, there was an article appearing in

---

[3] A statement appearing on the masthead of the magazine classifies it as an educational journal.

this section on James H. Pierce, a member of the Indiana chapter since 1920, entitled "California Phi Oldest Living Tarzan."[4] (2) The "What's going on in Phi Delta Theta" section announces any important upcoming event. For example, the Summer 1978 issue announced the fraternity's Biennial Convention and referred to it as "the single most important event in the fraternity program." The announcement went on to describe the convention as an event where representatives and members of the fraternity come together for current information on the status of the fraternity, and participate in the legislative decisions of the fraternity. (3) The "Phis in Sports" section features outstanding members in sports. For example, the Summer 1978 issue carried an article on the first five members of the 1977 All-Phi basketball team, as selected by the All-Phi Board, who were all repeaters from the 1976 team. (4) The "Directory" sets forth a list of all the officers of the general council, the staff of the general headquarters, and the current fraternity chapters by State, as well as the members of each chapter. (5) The "Chapter Grand" section is an obituary section which lists the deaths of members of the fraternity and a short biography of each deceased. (6) The "Alumni News" section covers significant happenings in some of the chapters.

During the taxable period ending June 30, 1979, the Scroll Fund earned $120,367 in investment income and incurred $5,730 in expenses directly attributable to the production of the investment income, with remaining net investment income of $114,637. During this taxable period, petitioner paid $96,374.21 in expenses directly associated with the publication and distribution of the Scroll. The expenses were paid from the net investment of the Scroll Fund through a reimbursement from the Scroll Fund to petitioner's general fund.[5] Net investment income in the amount of $18,262.79 remained in the fund as an asset of the fund.

---

[4]Pierce played the part in the first Tarzan movie and on radio for more than 5 years.

[5]The expenses were paid from petitioner's general fund, and at the end of the taxable period, funds totaling $96,374.72 were transferred from the Scroll Fund and paid into the general fund. These funds were intended as a reimbursement of the publication and distribution expenses of the magazine.

For the period ended June 30, 1979, petitioner excluded from the computation of unrelated business taxable income the net investment income of the Scroll Fund in the amount of $114,637. The basis for petitioner's exclusion of this income is the claim that the net investment income was set aside under section 512(a)(3)(B) for a purpose specified in section 170(c)(4). Respondent disallowed tax-exempt treatment to the net investment income of the Scroll Fund on the following grounds: (1) The Scroll is not published for an exempt purpose specified in section 170(c)(4), and (2) the net investment income was not "set aside" for an exempt purpose.

Robert J. Miller (Miller), petitioner's executive vice president, has been employed by the organization since 1951. Miller is familiar with petitioner's organizational and administrative structure as well as the publication procedures of the Scroll. He confirmed that in the years he has been employed by petitioner, the income from the Scroll Fund has not been used for anything except the publication of the Scroll and that there has been no projection for such funds to be used for anything else. Most of the material published in the Scroll is first filtered through the national office where Miller is employed, but some material is sent directly to the editor, who is located in Lubbock, Texas. Most of the material is sent in by individual members from the various chapters and alumni clubs.

Phillip R. Shriver (Shriver) was offered as petitioner's expert witness. In his opinion, the articles featured in the Scroll are educational in terms of underscoring the importance of leadership, growth and responsibility of citizens, and responsible conduct after the college years have ended. Shriver opined that approximately 85 percent of the contents of the Scroll is educational and 15 percent housekeeping and administrative material.

OPINION

Respondent's determination, as set forth in the notice of deficiency, is presumptively correct. Petitioner has the burden of proving that respondent's determination is incorrect. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). To meet its burden of proof, petitioner must show that the

Scroll was published for one of the exempt purposes specified in section 170(c)(4), and that the net investment income from the Scroll Fund was set aside under section 512(a)(3)(B) for such exempt purpose.

Petitioner argues that the publication of the Scroll magazine qualifies within the educational purview of section 170(c)(4). In support of its argument, petitioner relies upon factors such as: (1) The Scroll states on its masthead that it is an educational journal; (2) approximately 60,000 copies of each issue of the magazine are published for circulation to both the student and alumni members of petitioner, as well as to approximately 2,000 libraries and universities; (3) the contents of each magazine provide readers with positive role models and information on current topics of interest such as alcoholism and drug abuse; and (4) the Scroll encourages petitioner's members to make charitable donations to their alma maters as well as participate in school sponsored activities. Respondent counters petitioner's argument with the position that the main purpose of the Scroll is to disseminate fraternity news to petitioner's members and therefore, the net investment income generated by the Scroll Fund is not used for an exempt purpose specified in section 170(c)(4). Accordingly, such income is not subject to tax-exempt treatment under section 501(a). For the reasons set forth below, we agree with respondent.

Petitioner is a section 501(c)(7) organization. Consequently, it is subject to the provisions of sections 511 and 512(a)(3). Under section 511, section 501(c)(7) organizations are taxed on their gross income, less expenses directly attributable thereto, as "unrelated business taxable income," unless such income qualifies as "exempt function income" as defined in section 512(a)(3).[6] "Exempt function income" includes income "set aside" for a purpose specified in section 170(c)(4). Sec. 512(a)(3)(B).[7] Section 170(c)(4) speci-

---

[6]Sec. 511 provides the general rule that the "unrelated business taxable income" of an organization exempt from tax under sec. 501(c) is subject to income tax at the rates imposed on corporations.

[7]Sec. 512(a)(3)(B) defines "exempt function income" as follows:

the term "exempt function income" means the gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid. Such term also means all income (other than an amount equal to the gross income

fies as exempt those purposes which are exclusively religious, charitable, scientific, literary, or educational, or for the prevention of cruelty to children or animals.

The term "educational" is not defined under section 170(c)(4) or the regulations thereunder. However, in *Bob Jones University v. United States,* 461 U.S. 574, 586-587 (1983), the Supreme Court held that it is apparent, upon analyzing and construing section 501(c)(3) within the framework of the Code, that Congress intended the purposes contained in section 501(c)(3), and which are identical to those listed in section 170, to have the same meaning in both sections. Therefore, the term "educational" under section 170(c) is interpreted as having the same meaning as under section 501(c)(3).

Under section 501(c)(3), any fund which is organized and operated exclusively for educational purposes, and of which no part of its net earnings inures to the benefit of any private shareholder or individual, is exempt from tax pursuant to section 501(a). Section 1.501(c)(3)-1(d)(3)(i), Income Tax Regs., defines the term "educational" as follows:

(i) *In general.* The term "educational", as used in section 501(c)(3), relates to—

(*a*) The instruction or training of the individual for the purpose of improving or developing his capabilities; or

(*b*) The instruction of the public on subjects useful to the individual and beneficial to the community.

Whether a purpose is educational has been interpreted to imply more than the conveying of information or the providing of instruction, especially where the activity is conducted for a substantial nonexempt purpose. See *United States v. American College of Physicians,* 475 U.S. 834 (1986). The purpose must provide instruction or training which is intended to enable the recipient to develop and improve his capabilities, or instruct the public on subjects

---

derived from any unrelated trade or business regularly carried on by such organization computed as if the organization were subject to paragraph (1)), which is set aside—

(i) for a purpose specified in section 170(c)(4), or

(ii) in the case of an organization described in section 501(c)(9), to provide for the payment of life, sick, accident, or other benefits,

including reasonable costs of administration directly connected with a purpose described in clause (i) or (ii). If during the taxable year, an amount which is attributable to income so set aside is used for a purpose other than that described in clause (i) or (ii), such amount shall be included, under subparagraph (A), in unrelated business taxable income for the taxable year.

useful to the individual and beneficial to the community. An educational purpose is served only where a public interest, rather than a private interest of the petitioning organization, is the primary beneficiary of the educational activity. Sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs.

The editorial policy of petitioner's magazine is: (1) to provide readers with *information on developments and issues within the fraternity;* (2) To provide readers with *information* about the *achievements of petitioner's undergraduate members and alumni;* (3) to *feature prominent alumni and their accomplishments;* and (4) to provide readers with educational information about society and higher education. Also, the manual of Phi Delta Theta provides that "as the organ of Phi Delta Theta, *the Scroll presents material of interest to college men in general and Phis in particular."* (Emphasis added.) The manual provides, further, that "The Scroll is an important means of unifying the Fraternity and of maintaining the loyal interest of the alumni." We find such goals and stated policy to be borne out in the contents of the magazine.

The articles appearing in the Scroll are almost exclusively on (1) outstanding achievements of a successful alumnus in business, sports, the military, education, or Government; (2) announcements of members receiving awards which are tied closely to petitioner's organization;[8] and (3) an occasional article on alcoholism and drug abuse, anti-hazing, or safety. Other housekeeping matters covered in the Scroll are items such as fraternity news, announcements of the deaths of members, the listing of all the officers of the general council and the staff of the general headquarters, as well as a listing of all current chapters and the members of each chapter.

In addition, the testimony of Miller, petitioner's executive vice president, supports respondent's contention that the Scroll is petitioner's primary tool for dissemination of fraternity news to its members. Miller testified that the purpose of the Scroll was to promote among the members of the fraternity the awareness that there are important things

---

[8]For example, the award recipient featured in the Summer 1978 issue was Aloysius T. Hackenberg, who received the Raymond L. Gardner Award. As the winner of this award he was named "Phi of the Year" for 1977.

in life such as developing one's personality, continuing with education, and getting more out of the classroom. Miller further testified that subscription to the Scroll was open to the general public and could be secured by any nonmember through writing to petitioner and requesting membership. However, even though the Scroll has been published continuously since 1878, not one of the recipients of the magazine is a nonmember of petitioner's organization except the universities and libraries that receive complimentary copies.

The common element in each section of the magazine is subject matter devoted entirely to fraternity members and fraternity activities. The contents of the magazine, with the exception of an occasional article on drug abuse or alcoholism, serve to provide petitioner's members with an ongoing source of news concerning fellow alumni and current events affecting the fraternity. The main goal of the Scroll is to reach the members and provide them with information of interest. The information provided is of limited interest to a nonmember or the general public.

We could substitute the term "members" for the term "readers" as used in petitioner's editorial policy without any resulting significant change. Without producing any substantive change, petitioner's editorial policy could read as follows: (1) To provide members with information on developments and issues within the fraternity; (2) to provide members with information about the achievements of outstanding members; (3) to feature prominent alumni and their accomplishments; and (4) to provide members with educational information about society and higher education.

Shriver, petitioner's expert witness, opined that approximately 85 percent of the Scroll was educational. Shriver placed great emphasis on his contention that through its articles, the Scroll offered its readers positive role models to emulate. Also, he pointed out that the magazine publicized awards bestowed on outstanding members of the fraternity. We find petitioner's expert's perspective to be too narrow and his understanding of the term "educational" not to properly fit within the established tax law concepts. We are not bound by the opinion of an expert witness when that opinion is contrary to our own judgment based upon the record. *Kreis' Estate v. Commissioner,* 227 F.2d 753, 755

(6th Cir. 1955), affg. a Memorandum Opinion of this Court; *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court.

We agree that the successful alumni featured in petitioner's magazine may provide role models for the petitioner's members and could highlight the importance of continuing one's education. However, we do not agree that this, standing alone, makes the Scroll an educational magazine within the meaning of section 501(c)(3). The articles illustrate that some alumni have been successful in achieving goals and, possibly, that others may achieve these goals as well. The articles do not directly instruct or train petitioner's members on how to improve or develop their capabilities, nor do they instruct the public on subjects useful to the individual and beneficial to the community.

The requirement that the purpose be one of the specified exempt purposes is qualified by the requirement that it be exclusively for such purpose. The term "exclusively" has been interpreted to mean that the exempt purpose be the substantial purpose. Any nonexempt purpose must be insubstantial or incidental to the accomplishment of the exempt purpose. The presence of a substantial nonexempt purpose, therefore, will destroy the exemption. *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945); *Copyright Clearance Center, Inc. v. Commissioner*, 79 T.C. 793, 803-805 (1982). Determining whether the exempt purpose is the substantial purpose is largely a factual determination.

None of the approximately 60,000 copies of every issue of the Scroll mailed by petitioner were received by nonmembers, except the courtesy copies sent to the libraries and universities. Although the Scroll has been printed continuously since 1878, and Miller testified that subscription membership is available to members of the general public upon request and payment of the subscription fee, the Scroll is generally of interest to and is received only by petitioner's undergraduate members and alumni. Such a

select group does not satisfy the public interest requirement of section 1.501(c)(3)-1(d)(3)(i), Income Tax Regs., nor does it meet the requirement that the activity be conducted for a substantial exempt purpose. See *Better Business Bureau v. United States, supra; Retired Teachers Legal Defense Fund, Inc. v. Commissioner,* 78 T.C. 280 (1982); *Syrang Aero Club, Inc. v Commissioner,* 73 T.C. 717 (1980); *Callaway Family Association, Inc. v. Commissioner,* 71 T.C. 340 (1978).[9]

In *Retired Teachers Legal Defense Fund, Inc. v. Commissioner, supra,* the taxpayer was an organization formed to protect the financial stability of New York City's teachers retirement system. The organization sought exemption from tax under section 501(c)(3) as an educational organization.[10] In determining whether the organization qualified as an educational institution within the meaning of section 501(c)(3), the Court stated:

As applied to petitioner, its newsletter, which informs petitioner's members about the status of litigation designed to protect their property rights, clearly does not fall under the definition of "educational" as defined in the regulations. Petitioner's dissemination of information to its members, who are only one segment of the public, being limited to retirees of the system, involves a subject only useful and beneficial to these retirees' private interests (i.e., insuring the financial stability of their pension fund). [78 T.C. at 285.]

In the instant case, petitioner's magazine disseminates information of particular importance to its members only. Although we find that there may be some educational purpose served through petitioner's magazine, we hold that such a purpose is merely incidental to petitioner's substantial purpose of disseminating fraternity news and information to its members. Petitioner's magazine is not devoted exclusively to educational purposes.

Because of our determination of the first part of the issue before us, it becomes unnecessary to determine whether the funds of the Scroll Fund were "set aside" under section 512(a)(3)(B). Consequently, the net investment income of the

---

[9]See also *Minnesota Kingsmen Chess Association, Inc. v. Commissioner,* T.C. Memo. 1983-495.

[10]The activities conducted by the organization included undertaking litigation to protect the retirement fund and publishing a newsletter through which members of the taxpayer were informed of the stability of pension fund assets.

Scroll Fund is taxable to petitioner as unrelated business income.

To reflect the foregoing,

*Decision will be entered for respondent.*