CONFRERIE DE LA CHAINE DES ROTISSEURS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Confrerie De La Chaine Des Rotisseurs v. Comm'r
Docket No. 38018-87
United States Tax Court
T.C. Memo 1993-637; 1993 Tax Ct. Memo LEXIS 652; 66 T.C.M. (CCH) 1845; December 29, 1993, Filed *652 For petitioner: W. Cullen MacDonald. For respondent: Mitchell B. Hausman and Michelle A. Missry. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined deficiencies of $ 14,335 and $ 7,396 in petitioner's Federal income tax for 1982 and 1983, respectively. The sole issue for decision is whether the investment income earned during 1982 and 1983 by petitioner, an organization described in section 501(c)(7), constitutes unrelated business taxable income as defined by section 512(a)(3)(A). All section references are to the Internal Revenue Code for the years in issue. FINDINGS OF FACT The parties have stipulated some of the facts in this case. The stipulation of facts filed by the parties is hereby incorporated herein by reference. At the time it filed the instant petition, petitioner maintained its principal office in New York, New York. Petitioner was incorporated in 1959 under the Membership Corporations Law of the state of New York. Its certificate of incorporation states that it was formed for the following purposes: to promote, foster and encourage the art of cooking, the preparation and serving of foods and particularly the *653 technique of cooking by spit, barbecue, or rotisserie, and to collect and disseminate historical and other data and information with respect to the same; to foster and spread knowledge and understanding with respect to such forms of cooking and to cooperate with other persons or organizations whose aims and objectives in whole or in part are similar to those hereinbefore set forth.
Petitioner's bylaws state that the affairs, management, and operation of petitioner are given into the "general charge" of a board of directors composed of three or more members appointed annually by petitioner's "National President". Among other things, the board of directors is responsible for selecting a new national president when the individual holding that position dies, resigns, or becomes mentally or physically incapacitated. The bylaws also provide for an advisory board, the national council, composed of members appointed annually by petitioner's national president. The bylaws direct that petitioner shall be organized into local chapters each composed of members who reside in a given geographical area. Chapter presidents are appointed by the national president. The bylaws state that from *654 time to time the national council shall fix initiation fees and national dues. The national council is also authorized to impose special assessments on a limited basis. Local chapters are authorized to fix local chapter dues from time to time. Petitioner's bylaws stipulate that "Application for Admission [to membership in petitioner] shall be by invitation only." An application for membership is normally filed with the president of the chapter in the area in which the applicant resides and, if approved, is forwarded to the national president. Thus, membership in petitioner is normally obtained by joining a local chapter. However, the bylaws also provide for "Members at Large", a form of membership under which an individual joins the national organization but not a local chapter. Irrespective of the type of membership, the bylaws state that membership in petitioner entitles a person to "All National and international privileges", including receipt of Gastronome, a magazine published by petitioner, described in more detail below. Prior to 1980, petitioner periodically sent to all of its members a publication entitled the Chaine Letter. The summer 1979 issue of the Chaine Letter *655 contains articles of general interest concerning cooking, some of which make no reference to petitioner or to any of its chapters, and some of which make reference to petitioner or to one or more of its chapters, but focus principally upon cooking. The summer 1979 issue of the Chaine Letter also contains articles which would be of principal interest to petitioner's members, including articles about petitioner or about the activities of one or more of its chapters, and information such as membership lists and the names of petitioner's officers. In 1980, petitioner commenced publication of a magazine entitled Gastronome. The first edition of the magazine, the winter 1980 issue, contains a column entitled "President's Message" consisting of an open letter to petitioner's membership from petitioner's national president. The letter states in part as follows: I am proud of all the accomplishments which we have achieved together. But most of all, I am pleased to present to you this first edition of Gastronome. It will replace the Chaine Letter which grew as the chronicler of our activities to the point where it was clearly no longer a letter, but a magazine. And as a magazine, *656 it merited a new face, a new format, a new title. Within the first issue of Gastronome, you will find articles prepared by some of the outstanding food professionals of the country. This does not mean, of course, that material presented by our talented amateurs has been overlooked or neglected; there is real need for their contributions. Yet, if our membership is to be in the forefront of gastronomy, we need the guidance of the best and most informative food personalities of our country.
Petitioner published a document entitled Information on Publications that was prepared for circulation to prospective advertisers. That document describes Gastronome as follows: GASTRONOME MAGAZINE Gastronome is a deluxe magazine singularly dedicated to the gastronomic elite. For this audience, it provides provocative commentary on the state of the art and an ongoing review of haute gourmet activities throughout America. It is referred to as the "food trendies' bible." The first section contains in-depth articles by the world's foremost food and wine authorities on topical and controversial subjects of interest to connoisseurs of the gastronomic art. Writers and photographers *657 whose by-lines appear in Gastronome include: Jean Anderson, Richard Arrowood, Robert Balzer, Anthony Dias Blue, Michael Broadbent, Guiliano Bugialli, Marian Burros, Julia and Paul Child, Ruth Ellen Church, Craig Claiborne, Florence Fabricant, Patrick Fegan, Barbara Figueroa, Craig Goldwyn, Marion Gorman, Gael Greene, Nika Hazelton, Jay Jacobs, Barbara Kafka, George Lang, Rita Leinwand, Harriet Lembeck, Alexis Lichine, John Mariani, Alexander McNally, Peter Morrell, Jacques Pepin, Richard Peterson, Marina Polvay, Robert Pritsker, William Rice, Lynne Roberts, Peter Sichel, Ruth Spear, Gerald Stein, Barbara Tober, James Villas, Paul Wolfert, Dan Wynn, Janet Yaseen, Roger Yaseen. The second section, entitled "Gastronomy Alive: Chaine Events in Review," is regarded by amateur and professional food experts as a unique mirror reflecting the practice and trends in gastronomic art in America. Most of the reviews include the menus and lavish color photographs, which became guidelines for future event planning. Gastronome magazine *658 is published twice a year; Spring and Autumn on 80-pound coated stock. Its sophisticated editorial subjects and stylish design make it a magazine that is read from cover to cover, shown to fellow connoisseurs, and kept as a permanent reference.
On the whole, we find the above statement to be an accurate description of the issues of Gastronome contained in the record of this case. During 1982 and 1983, the years involved in this case, petitioner published three issues of Gastronome: The summer 1982 issue, the winter 1982-83 issue, and the autumn 1983 issue. In each of those issues, approximately one-half of the pages of the magazine is devoted to articles pertaining to food and its preparation, and the other half of the pages is devoted to the section of the magazine entitled "yGastronome Alive: Chaine Events in Review." This section contains articles about cooking that, typically, are based upon the events sponsored by one or more of petitioner's chapters. This section also contains pictures of chapter events, menus used at chapter events, lists of members and officers, and petitioner's financial statements. Petitioner printed approximately 6,200 copies of each of the subject *659 three issues of Gastronome. Approximately 65 copies of each of these issues were distributed to nonmembers of petitioner. On a few occasions, petitioner received requests from persons seeking permission to reprint an article. One request came from a school that wanted to use an article in one of its courses. Currently, approximately 130 copies of each issue of Gastronome are distributed to nonmembers. All issues of Gastronome, beginning with the spring 1981 issue, contained order forms that could be used by the general public to subscribe to the magazine. For example, the order form contained in the summer 1982 issue of Gastronome offered a subscription to three issues for $ 12 or a subscription to six issues for $ 20. Petitioner utilized an accrual method of accounting. Petitioner's financial statements for 1981 and 1982 are published in the August 1983 issue of Gastronome and its financial statements for 1982 and 1983 are published in the autumn 1984 issue of Gastronome. Petitioner's 1982 and 1983 financial statements are reproduced below: Balance Sheets -- General Operating Fund
Assets 1982 1983 Cash
$  21,315
$ 109,758
Investments in non-equity marketable securities,
as [sic] cost (approximates market value)
573,585
371,937
Furniture and fixtures, less accumulated
depreciation of $ 15,381 and $ 21,701
18,303
12,644
Demand note receivable from employee, interest
payable quarterly at 1 percent over prime
--
20,000
Prepaid expenses and other
2,276
6,885
615,479
521,224
Liabilities and Fund Balance Accrued expenses and other payables
107,206
75,338
Payable to special building assessment fund
164,447
14,025
Deferred dues income, net of dues paid
to date to international headquarters
of $ 39,478 and $ 12,893
215,355
222,636
487,008
311,999
Fund balance
128,471
209,225
615,479
521,224
*660 Statements of Changes in Fund Balance -- General Operating Fund
Income:
1982
1983
Dues:
Continuing members
$ 325,662 $ 388,694 New members
146,670 161,711 Reinstatement and promotion
13,247 15,280 485,579 565,685 Less dues to international
headquarters
(108,606)
(100,869)
376,973 464,816 Sales of decorations
13,053 14,612 Interest and miscellaneous
55,760 54,975 445,786 534,403 Expenses:
Publications
111,068 141,178 Salaries
66,523 78,276 Travel and promotion
57,640 57,699 Purchase of decorations
55,899 24,404 Rent and maintenance
21,756 23,116 Postage and mailing
16,050 16,077 Annual meeting and conventions
18,612 15,620 Travel and promotion --
Regional bailliages
14,013 15,422 Foreign currency transaction loss
--   15,021 Contributions
3,525 10,875 Insurance
9,411 10,644 Telephone
8,487 10,263 Stationery and printing
12,680 9,849 Depreciation
6,604 6,320 Office
4,809 5,372 Messengers
4,094 2,998 Payroll and other taxes
3,199 3,113 Professional and consulting fees
4,750 5,000 Customs broker
1,591 665 Education
949 --   Miscellaneous
1,509 1,737 423,169 453,649 Excess of income over expenses
22,617 80,754 Fund balance, beginning of year
105,854 128,471 Fund balance, end of year
128,471 209,225 *661 As shown above, the cost of publishing Gastronome was $ 111,068 in 1982 and $ 141,178 in 1983. During 1982 through 1983, petitioner maintained one or more checking accounts at Bankers Trust Co. The record of this case does not include any bank statements from Bankers Trust Co. Petitioner also maintained one or more investment accounts at Wertheim & Co., Inc. The record contains various statements from two accounts maintained by petitioner at Wertheim & Co., Inc. One of those accounts was designated "Chaine Building Fund" and was assigned an account number, the last four digits of which are 9535. The other account was designated "Chaine Des Rotisseurs Ltd." and was assigned an account number, the last four digits of which are 2149. In addition to certain other information, each of the Wertheim & Co., Inc. statements sets forth the "Net Portfolio Valuation" of the assets in the account at the end of the month for which the statement was issued, and it sets forth the "U.S. Gov't/Agency Obligation Interest" and "Dividends" received during the month. The statements contained in the record of this case reflect the following information: Interest
Net Portfolio Value U.S. Gov't
Account 9535
Account 2149
Obligations
Dividends
Total
31-Dec-82
$ 176,381.25
31-Jan-83
$ 307,451.59
$    751.83
28-Feb-83
0.00
354,515.18
$  8,606.25
765.71
31-Mar-83
384,274.89
1,578.13
512.38
30-Apr-83
379,032.44
1,936.98
650.27
31-May-83
402,067.49
5,812.50
612.90
30-Jun-83
392,053.11
0.00
1,480.52
31-Jul-83
369,425.74
0.00
1,535.88
31-Aug-83
358,425.26
8,606.25
1,307.67
30-Sep-83
318,129.06
0.00
1,379.35
31-Oct-83
290,126.83
1,781.25
1,102.57
30-Nov-83
281,159.60
0.00
864.77
30-Dec-83
371,075.35
0.00
843.95
Totals
28,321.36
11,807.80
$ 40,129.16
*662 Generally, during the years in issue, petitioner's agents deposited funds, such as membership fees and dues, into one of the investment accounts at Wertheim & Co. at the time the funds were received by petitioner. The funds were invested in U.S. Government obligations or other income-producing assets. The funds were later transferred to petitioner's principal checking account at Bankers Trust as needed to pay petitioner's expenses. The payment of all of petitioner's expenses, including the expense of publishing Gastronome, were handled in the same way. Petitioner had no policy of earmarking the investment income which it earned on the assets invested through its accounts at Wertheim & Co., Inc., to defray the cost of publishing Gastronome. Furthermore, there was nothing contained in petitioner's records which designated that the investment income was to be used exclusively to pay the costs of publishing Gastronome. During each of the years in issue, petitioner filed Forms 990, Return of Organization Exempt from Income Tax, with the Commissioner of Internal Revenue. The revenues and expenses reported on those returns are summarized as follows: 1982 1983 Membership dues and assessments
$ 573,394
$ 580,297
Interest on savings and
temporary cash investment
69,617
46,255
Other revenue
1,143
8,720
Total revenue
644,154
635,272
Other salaries and wages
66,523
78,276
Payroll taxes
3,199
3,113
Accounting fees
4,750
5,000
Supplies
188
426
Telephone
8,487
10,263
Postage and shipping
16,050
16,076
Occupancy
21,756
12,446
Printing and publications
111,068
141,178
Travel
24,451
18,028
Conferences, conventions
and meetings
20,683
30,101
Depreciation, depletion, etc.
6,604
17,572
Dues to international headquarters
108,606
100,869
Purchase of decorations
55,899
24,404
Travel and promotion-regional
14,013
15,422
Office expense
4,809
5,372
Stationery
12,680
9,849
Customs
1,591
665
Insurance
9,411
10,644
Entertainment and promotion
31,118
25,188
Contributions
3,525
10,875
Messengers
4,094
2,998
Maintenance
10,670
Foreign currency transaction loss
15,021
Miscellaneous
2,270
1,312
Total expenses
531,775
565,768
Excess (deficit) for the year
112,379
69,504
*663 For 1982, the excess of revenue over expenses reported on petitioner's tax return, $ 112,379, is $ 89,762 more than the excess of income over expenses reported on its financial statement, $ 22,617. This difference stems from the fact that the total revenue reported on petitioner's tax return, $ 644,154, is $ 89,762 more than the income reported on petitioner's income statement, $ 554,392 (i.e., $ 445,786 plus $ 108,606, dues to international headquarters). The record does not explain this difference. For 1983, the excess of revenue over expenses reported on petitioner's tax return, $ 69,504, is $ 11,250 less than the excess of income over expenses reported on its financial statement, $ 80,754. This difference is principally due to the fact that the depreciation expense claimed on petitioner's tax return, $ 17,572, is $ 11,252 more than the depreciation expense claimed for book purposes, $ 6,320. Petitioner reported no unrelated business taxable income for 1982 or 1983. Following respondent's audit of those returns, respondent determined that the investment income reported by petitioner constituted unrelated business taxable income and was subject to the tax imposed by section *664 511(a)(1). The subject notice of deficiency describes this adjustment as follows: It is determined that your net investment income for the tax years ended December 31, 1982 and December 31, 1983 does not qualify as exempt function income as defined in section 512(a)(3)(B) of the Internal Revenue Code and is included in the computation of unrelated business taxable income in accordance with section 512(a)(3)(A) of the Internal Revenue Code. Accordingly, your taxable income is increased by $ 69,617.00 and $ 46,255.00 for the tax years ended December 31, 1983 in each year respectively.
OPINION The parties agree that petitioner is an organization described in section 501(c)(7), as follows: (7) Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder.
Accordingly, the parties also agree that petitioner is exempt from taxation pursuant to section 501(a). Notwithstanding its status as an exempt organization, petitioner is subject to tax on its "unrelated business taxable income." Secs. 501(b), *665 511(a). As applicable to an organization, like petitioner, that is described in section 501(c)(7), the term "unrelated business taxable income" is defined by section 512(a)(3)(A) as follows: (A) General Rule. -- In the case of an organization described in paragraph (7), (9), (17), or (20) of section 501(c), the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income), both computed with the modifications provided in paragraphs (6), (10), (11), and (12) of subsection (b). * * *
Thus, all of the gross income of a section 501(c)(7) organization, less the deductions directly connected thereto, is taken into account in computing unrelated business taxable income, excluding the organization's "exempt function income" and the deductions related thereto. For this purpose, the phrase "exempt function income" is defined by section 512(a)(3)(B) as follows: (B) Exempt Function Income. -- For purposes of subparagraph (A), the term "exempt function income" means the gross income from dues, *666 fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid. Such term also means all income (other than an amount equal to the gross income derived from any unrelated trade or business regularly carried on by such organization computed as if the organization were subject to paragraph (1)), which is set aside -- (i) for a purpose specified in section 170(c)(4), or (ii) in the case of an organization described in paragraph (9), (17), or (20) of section 501(c), to provide for the payment of life, sick, accident, or other benefits,
including reasonable costs of administration directly connected with a purpose described in clause (i) or (ii). If during the taxable year, an amount which is attributable to income so set aside is used for a purpose other than that described in clause (i) or (ii), such amount shall be included, under subparagraph (A), in unrelated business taxable income for the taxable year.
It is evident that the investment *667 income at issue in this case does not fit under the first sentence of the above definition of exempt function income, viz, "dues, fees, charges, or similar amounts paid by members of the organization". See sec. 512(a)(3)(B). Accordingly, the narrow question in this case is whether the subject investment income fits under the second sentence of the definition of exempt function income, viz, "income * * * which is set aside for a purpose specified in section 170(c)(4)". See sec. 512(a)(3)(B). To prevail on this question, petitioner must prove that publishing Gastronome qualifies as one of the exempt purposes specified in section 170(c)(4), and that the investment income at issue in this case was "set aside" for such exempt purpose. Phi Delta Theta Fraternity v. Commissioner, 90 T.C. 1033, 1038 (1988), affd. 887 F.2d 1302 (6th Cir. 1989). For the reasons discussed below, we agree with respondent that petitioner has failed to prove that the subject investment income was "set aside" within the meaning of section 512(a)(3)(B). Accordingly, we agree that the subject investment income does not qualify as exempt function income *668 and, thus, is not excluded from petitioner's unrelated business taxable income, as defined by section 512(a)(3)(A). It is unnecessary for us to reach the second issue in this case, whether publishing Gastronome is a purpose specified in section 170(c)(4). Petitioner acknowledges that, as general rule, an exempt organization described in section 501(c)(7) is subject to tax on its investment income, except to the extent that the income has been set aside for a "scientific, literary, or educational" purpose described in section 170(c)(4). However, petitioner advances the proposition that any investment income that is spent during the year for a tax-exempt purpose "is entitled to tax-exempt treatment even though it had not been first set aside before expenditure". As authority for that proposition, petitioner refers to section 1.512(a)-3, Proposed Income Tax Regs. Those proposed regulations were originally published in the Federal Register on May 13, 1971, 36 Fed. Reg. 8809, but were withdrawn on January 26, 1987, 52 Fed. Reg. 2724. Section 1.512(a)-3(c)(3)(iii), Proposed Income Tax Regs., states as follows: (iii) Purposes *669 for which income may be set aside. Income may be set aside for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. In the case of a national organization of college fraternities or sororities, income may be set aside for scholarships, student loans, loans on local chapter housing, leadership and citizenship schools and services, and similar purposes. In the case of an employees' association, income may be set aside to provide for the payment of life, sick, accident, or other benefits. Income also may be set aside to pay any reasonable costs of administration which are directly connected with the disbursement or other handling of income which is set aside. If a social club or an employees' association expends an amount for a purpose described in section 512(a) (3)(B), such amount may be treated as though it had been first set aside, and then expended, for such purposes. For example, assume that during the year a social club has $ 1,000 of net investment income and $ 5,000 of net income from an unrelated trade or business. If the social club contributes $ 3,000 during the year to a charitable organization, *670 it may wish to treat $ 1,000 of the contribution as a set aside while treating the remaining $ 2,000 as a direct charitable contribution. Amounts treated as exempt function income by reason of being set aside are not deductible under section 170 or any other section. [Emphasis supplied.]
Petitioner contends that "logic and common sense" also compel the same conclusion. That is, if the funds have been spent during the year for a tax-exempt purpose, then there is nothing to set aside, and the amount spent automatically qualifies under section 512(a)(3)(B) as exempt function income. Petitioner acknowledges that a different subdivision of the proposed regulations, section 1.512(a)-3(c)(3)(v), Proposed Income Tax Regs., states that investment income will not satisfy the set-aside requirement unless it is specifically earmarked for a tax-exempt purpose or placed in a separate account or fund. That subdivision of the proposed regulations states as follows: (v) Requirements for set aside. Net income set aside for a purpose enumerated in subdivision (iii) of this subparagraph must be specifically earmarked as such or placed in a separate account or fund. Thus, something *671 more than a bookkeeping entry is required before income will be considered to have been set aside. Any action describing the income set aside and indicating that it is to be used for one of the designated purposes is sufficient. Income that is set aside need not be permanently committed to such use either under State law or by contact. Thus, for example, it is not necessary that the organization place these funds in an irrevocable trust.
Petitioner argues that the two subdivisions of the proposed regulations are not in conflict but in harmony. According to petitioner, any investment income that is on hand at the end of the taxable year must be "earmarked" for a tax-exempt purpose, whereas any investment income that has been spent during the year for a tax-exempt purpose has been constructively set aside. Petitioner's post-trial brief states as follows: both Proposed Regulations support petitioner's position: if the money is not spent during the year received, it should be "earmarked" for future qualified expenditure; if it is indeed spent for an exempt purpose during the year received, it has in effect been "earmarked" and appropriately expended.
Turning to the *672 facts of this case, petitioner contends that the subject investment income was constructively set aside during each of the years at issue because it was used to defray the cost of publishing Gastronome. Petitioner's post- trial brief states as follows: Because petitioner is a tax-exempt organization under I.R.C. § 501(c)(7) and because all investment income it receives is expended during each year in question for the publication of Gastronome in furtherance of petitioner's exempt purposes, such investment income should be treated as set-aside in satisfaction of I.R.C. § 512(a)(3)(B). * * *
Thus, petitioner advances the factual contention that all of the investment income for each of the 2 years was "expended * * * for the publication of Gastronome". Based solely upon that factual contention, petitioner argues that the set-aside requirement was satisfied in this case. Petitioner does not contend that the set-aside requirement was satisfied in any other way. The only basis for petitioner's factual contention that the subject investment income was expended for the publication of Gastronome appears to be the following assertion: As both a budgetary and historical *673 matter, expected Gastronome expenses have always exceeded the interest income; during 1982 and 1983, more than twice as much was spent on Gastronome ($ 252,000) as was earned as interest ($ 115,000).
We agree that the aggregate cost of publishing Gastronome during the 2 years at issue was greater than the amount of investment income earned by petitioner during the same period. The parties have stipulated as much. That fact, however, does not establish that the subject investment income was expended for the publication of Gastronome. Indeed, in this case, we are unable to find that the subject investment income was even spent during the year in which it was realized. For example, petitioner's tax returns report excess revenues over expenses of $ 112,379 for 1982 and $ 69,504 for 1983. Each of those amounts is greater than the investment income reported, viz, $ 69,617 and $ 46,255, respectively. Moreover, even if we were to assume that the subject investment income had been spent during each of the years in issue, we have no basis to conclude that it was spent to pay for the cost of publishing Gastronome. The investment income that petitioner realized from the assets *674 held in its accounts at Wertheim & Co., Inc., was commingled with petitioner's receipts from all other sources. There is no evidence that, during the years in issue, petitioner earmarked its investment income, or dedicated it in any way, to pay the cost of publishing Gastronome. Petitioner produced no such evidence pursuant to respondent's subpoena for documents reflecting petitioner's set-aside policy during the years 1982 and 1983. Additionally, petitioner's executive director from 1977 through October 1987, Ms. Joan Schumacher, testified that she was unaware of any "policy with regard to how interest income of the Chaine would be spent". Ms. Schumacher described her duties as an employee of petitioner in the following terms: I was executive director for the national organization which included the day-to-day operations of running the national office, which entailed coordinating inductions of new members throughout the United States, collecting all membership funds, billing, any billings involved for dues, advertising fees, managing the office, all financial matters, liaison with the accountants in preparing the annual report, keeping membership statistics as to the various *675 chapters in the United States, and submitting any monies or correspondence or information on the U.S. members to the parent headquarters.
It is clear from Ms. Schumacher's testimony that petitioner had no policy linking petitioner's investment income and its expense of publishing Gastronome. In summary, petitioner's contention that the subject investment income was "set aside" hinges on its factual contention that the investment income was spent during each of the 2 years for publication of Gastronome. Based upon the record in this case, we cannot find that the money was even spent, or if it was spent, we have no basis to find that it was spent to pay the cost of publishing Gastronome, as opposed to any of the other expenses incurred by petitioner during the subject years. Therefore, we find that petitioner has not proven that the subject investment income was expended for the publication of Gastronome. Since this is the sole factual basis for petitioner's contention that the subject investment income was set aside, we reject petitioner's contention that the subject investment income was set aside during each of the years in issue as required by section 512(a)(3)(B). We *676 express no opinion about the legal proposition advanced by petitioner that income automatically qualifies as having been set aside within the meaning of section 512(a)(3)(B) if it is spent during the year received for a tax-exempt purpose. See generally Phi Delta Theta Fraternity v. Commissioner, 887 F.2d 1302 (6th Cir. 1989), affg. 90 T.C. 1033 (1988). For the foregoing reasons, Decision will be entered for respondent.