THE NATIONALIST MOVEMENT, A MISSISSIPPI NON-PROFIT CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10540–91X.          Filed April 11, 1994.

*Richard Barrett*, for petitioner.
*Vivian A. Moore* and *Joan R. Domike*, for respondent.

OPINION

HAMBLEN, *Chief Judge*: Respondent determined that petitioner, The Nationalist Movement (sometimes abbreviated as TNM), does not qualify for exemption from Federal income taxation under section 501(c)(3).[1] Petitioner has challenged

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986. Rule references are to the Tax Court Rules of Practice and Procedure.

respondent's determination by invoking the jurisdiction of this Court for a declaratory judgment pursuant to section 7428(a). The parties agree that petitioner has exhausted the administrative remedies available within the Internal Revenue Service (IRS) and has timely filed its petition in this Court. See sec. 7428(b).

A preliminary issue for decision is: (1) Whether an appendix to petitioner's brief is a proper supplement to the administrative record under Rule 217(a). The statutory issues, which relate to whether petitioner operates exclusively for exempt purposes within the meaning of section 501(c)(3), are: (2) Whether, without regard to specific activities, petitioner more than incidentally serves a private interest rather than a public interest; and (3) whether, in view of petitioner's specific activities, including publication and distribution of a monthly newsletter, petitioner operates exclusively for charitable and/or educational purposes. The constitutional issues are: (4) Whether Rev. Proc. 86–43, 1986–2 C.B. 729, is unconstitutionally vague or overbroad on its face, or otherwise unconstitutional as applied, in contravention of the 1st, 5th, and 14th Amendments; and (5) whether respondent has violated due process and equal protection rights by treating petitioner differently than others similarly situated.

## Background

This case was submitted for decision under Rule 217 on the basis of a stipulated administrative record, which is incorporated herein by reference. At the time of filing the petition, the principal office of petitioner was in Jackson, Mississippi.

In applying for a State charter as a nonprofit corporation, which Mississippi approved, on June 8, 1987, petitioner's incorporators stated the purposes of the organization as follows:

To promote democracy and the rights of the American people; to uplift those who work, the poor, the sick, the aged and the distressed; to strengthen the Constitution, nationality, independence and freedom of the nation; to advance social justice; to charter and organize chapters and kindred organizations, all as a 501(c)(3) tax-exempt organization. * * *

The charter showed the domicile of the organization as "c/o Richard Barrett", followed by a Mississippi address.

According to its constitution, adopted on June 21, 1987, petitioner was to be "a non-profit charitable, educational and fraternal organization dedicated to advancing American freedom, American democracy and American nationalism." The overseeing board was to consist initially of a chairman (also known as the speaker and chief executive officer), a secretary, and a treasurer. The chairman was to have sole management authority, including the appointment and expulsion of officers (i.e., board members), subject to override by a combined three-fourths vote of the board and a three-fourths vote of the "working" membership. Of the five classes of membership described in the constitution, only the working membership was entitled to vote or to hold office.

Under petitioner's bylaws, also adopted on June 21, 1987, all applicants for working, regular, and student memberships were to "submit an application, written and signed, adhering to the ideals of the organization and agreeing to abide by the Constitution, By-laws, rules and regulations of the organization." Prospective working members were required to submit, in addition, a recommendation from a current working member or officer. Applicants were to become members upon approval by the chairman.

Through its spokespeople, supporters, and other means of disseminating information, petitioner advocates social, political, and economic change in the United States. More specifically, petitioner espouses a "pro-majority" philosophy, which generally favors those Americans who are white, Christian, English-speaking, and of northern European descent. In a pamphlet entitled "Why Join The Nationalist Movement?", the enclosed membership application states:

> I apply for membership in The Nationalist Movement vowing freedom as the highest virtue, America as the superlative nation, Christianity as the consummate religion, social justice as the noblest pursuit, English as the premier language, the White race as the supreme civilizer, work as the foremost standard and communism as the paramount foe.

Petitioner's promajority philosophy is intended to counteract minority "tyranny", which supposedly takes the form of special favors and privileges for minority groups, such as hiring quotas and affirmative action. For most of its existence, peti-

tioner has strongly advocated repeal of the Civil Rights Act and the Voting Rights Act.[2]

Petitioner's view of the appropriate government in the United States is a majority rule, winner-take-all democracy. In this regard, petitioner favors voting in at least some elections and on certain policy matters, such as busing and immigration, by means of nationwide initiatives and referenda. To petitioner, foreigners and domestic minorities are generally considered "unassimilable" and "incompatible", and petitioner favors voluntary emigration or repatriation for these people.

Petitioner often encourages its supporters to collect food and clothing for, and otherwise assist, the poor, sick, and elderly. Petitioner includes Christian observances in its public activities and sometimes conducts ceremonies that center around the raising of an American flag or the laying of memorial wreaths.

Most of petitioner's members are young, with an average age in the low twenties, and some join at age 12 or 13 or even younger. In late 1989, petitioner's fastest growing segment of supporters was high school students. Petitioner's literature refers to students as the "wellspring" of nationalist activity and to youth as the "mainstay" and "seedbed" of petitioner.

Richard Barrett (Barrett), who handles day-to-day operations, has been petitioner's chairman since its incorporation in 1987. He is petitioner's chief spokesperson and also serves as its attorney and treasurer. According to Barrett, the most authoritative work concerning petitioner's program is a book entitled "The Commission", which he authored in 1982. Nearly half of the 394-page text is an autobiographical account from early childhood forward, including a military tour of duty in Vietnam and subsequent political involvement. As recounted in the book, Barrett ran unsuccessfully in Mississippi for the State legislature in 1970 and for the governorship in 1980. The latter half of the book presents Barrett's view of the nationalist position in a wide range of subject areas. These chapters are entitled "Life", "Freedom", "The Citizen", "Constitution", "The American", "Labor", "The

---

[2] During the administrative process with the IRS, petitioner represented that it would no longer advocate the passage or repeal of legislation.

People", "Race", "Population", "The Nation", "The World", "Culture", "Education", "The Woman", "Morality", "Military", "The Law", and "Religion".

At its first national convention, in July 1988, petitioner adopted a comprehensive platform of 50 subjects. The topics covered included the environment, religion, crime, jobs, social justice, abortion, war, the right to keep and bear arms, the flag, drugs, the news media, morality, and commerce. Among the specific provisions were the following:

### 1. *Government*

(a) America must be one, indivisible, sovereign and independent nation ruled as a democracy by the majority of the American people.

\* \* \* \* \* \* \*

### 2. *Labor*

(a) Work must be the common denominator of American nationality. Those who are productive and hard-working must be rewarded with better pay, decent working conditions and an advanced standard of living.

(b) Those who loaf shall no longer be supported by those who work.

\* \* \* \* \* \* \*

### 6. *Justice*

(a) There shall be justice for all, favors for none. All institutions and endeavors shall remove all vestiges of privilege and special favors for the few, the minorities and the rich.

\* \* \* \* \* \* \*

### 27. *Special Interests*

(a) All laws which prohibit the freedom of the American people to buy and sell, hire and fire, live and work, vote and run for office, shall be repealed.

(b) Special favors for minorities (such as quotas and affirmative action) shall give way to democratic rule by the majority, until the last vestiges of special-interest tyranny is [sic] removed from every corner of the nation.

(c) Racial busing to promote integration shall be abolished.

\* \* \* \* \* \* \*

### 29. *Communism*

(a) Communism must be defeated and every trace of it rooted out within our borders and throughout the world.

\* \* \* \* \* \* \*

### 30. *Citizenship*

(a) Citizenship shall be restricted to real Americans only who pass rigid tests for parentage, nationality, health, morality, literacy and adherence to American standards.

(b) No non-American, anti-American or un-American shall vote or hold office. Gerrymandered districts created to give special privileges to minorities shall be annulled in favor of districts which assure democratic rule by the majority.

Barrett began a 1988 fund-raising letter for petitioner with: "Will you sign my petition to keep gangs of minorities from replacing government by the people?" He went on to describe some incidents of perceived injustice carried out by minorities against whites, including the beating of a high school student, demands for the ouster of white school officials and other white workers, and the tearing down of an American flag. Concerning proposed action, the letter stated:

Here's my plan.
We'll do for the majority in the 1980's what others did for the minorities in the 1960's.
Parading, speaking, rallying, petitioning.
Only we won't riot, loot or burn. We'll wave flags, win lawsuits, sing songs and gain power.

The attached petition, directed at "Public Officials", read:

I am an American, freedom-loving citizen. As such, I protest the never-ending, escalating demands of minorities; I deplore the violence used by minorities when the American majority gets in their way * * * and I denounce the un-democratic public officials who cater to the minorities over the American majority.

I call upon you to defeat each and every demand by the minorities, to regain all the rights we have already lost, to remove rowdies from schools by abolishing compulsory attendance, to restore discipline and learning to classrooms and to assure democracy, decency and opportunity for American youth.

A few times a year, sometimes in conjunction with its annual conferences, petitioner conducts "Warrior Weekends" involving physical and weapons training for members. Petitioner does not, however, advocate the use of threats, violence, or illegal acts. Petitioner uses "Strikers", who are unarmed young men in camouflage attire, to protect its other supporters during public events. So-called skinheads, who

often participate in the weekend events, have long been welcomed as members.[3]

Important activities for petitioner in terms of public exposure and impact are the conducting of, or participation in, "public forums", speeches, rallies, and parades. For broadcast media exposure, spokesperson Barrett sometimes appears as a guest on radio and television talk shows, some aired nationwide. On the talk shows, the interviewer or moderator is often skeptical or even hostile toward Barrett's views, as are other studio guests and those listeners and viewers whose comments and questions are broadcast. Barrett also occasionally engages in prearranged debates, some of which are broadcast.

Petitioner publishes a four-page monthly newsletter entitled "All the Way", with the subtitle "Fighting Journal of The Nationalist Movement", and distributes it largely by mail. Each issue includes a simple order form that, among other things, permits the reader to purchase an annual membership for $20 (regular) or $10 (youth). Sometime before mid-1990, the order form began to include blanks for "Age", "Work", and "Marital", followed by the statement, "Applicant accepts TNM goals and rules". Most of petitioner's memberships, at least in its first 2 years, originated in the order form of the newsletter.

Although membership dues include a subscription to the newsletter at no additional charge, the order form in the newsletter indicates that subscriptions are also available to the nonmember public for $12 annually. Those qualifying for free copies, as stated in each issue, are "disabled veterans or unemployed, students or elderly without income". The November 1988 issue encouraged readers to "Order and distribute" extra copies, and the March 1989 issue stated that a planned expansion of the newsletter would be "more readable when handed out on streets."

Barrett has been the editor of the newsletter since October 1988 and thus generally controls the topics covered, although he does receive input from members and other readers. Among its varied contents, which do not include advertising, the newsletter reports on past and upcoming rallies,

---

[3] An information sheet distributed by petitioner to supporters defines skinheads as "Nationalist, pro-majority youth who wear boots and cut their hair short and who lawfully engage in self-defense of their persons, schools, neighborhoods and nation."

speeches, litigation, and other events, answers questions about petitioner, and provides editorial commentary. As an example of the latter, an early issue noted, without elaboration, petitioner's "common sense" standards for Justices of the Supreme Court, including "No odd or foreign name", "No beard", "Christian and Protestant", and "Anti-ERA [Equal Rights Amendment] and anti-busing." Since 1990, each issue has contained a disclaimer that "Views [are] not necessarily those of TNM."

Recurring adversaries in the newsletter are "black-power" activists and groups, the latter sometimes characterized as gangs, mobs, or invaders.[4] A specific antagonist is Hosea Williams, who in January 1987 had led a march, termed by the newsletter a "black-power invasion", in predominantly white Forsyth County, Georgia.[5] At the time, Barrett had organized a protest against the march, and most of the newsletters make some reference to the "invasion" or its anniversary. Another event often recounted or referred to is petitioner's protest, led by Barrett, of the 1988 Democratic National Convention in Atlanta, Georgia.

A very common editorial topic is the Federal holiday commemorating the birth of Martin Luther King, Jr. (King). In November 1987, the newsletter urged readers to attend a parade in Greensboro, North Carolina, supporting abolition of the holiday; this event would "kick off month-long Anti-King activities across the country." The next month's issue included purported background information on King relating to his "scandalous" personal life, his "communist associations", and his alleged propensity for violence.

As paraphrased in the November 1988 newsletter, Barrett responded as follows to a question during a talk show broadcast about what the future holds:

instead of a holiday for Martin Luther King, there would be a day honoring Mike Moran, the Newark, New Jersey policeman shot in the back by King-instigated looters and rioters in 1968. "No King Over Us," he said.

---

[4] References to black people are usually to "non-whites", "minorities", or "Negroes". According to the August 1988 issue, "black" is not used as a noun because "Communist Stokeley [sic] Carmichael coined use of 'black' as part of his call for 'black power.' The word is demeaning to whites and to non-communists."

[5] This event is described in some detail in *Forsyth County v. Nationalist Movement*, 505 U.S. ___, ___, 112 S. Ct. 2395, 2398–2399 (1992).

The next issue announced that in conjunction with a parade and rally commemorating the January 1987 "invasion", the King "communist record" would be read. The next issue, January 1989, urged the unsealing of Government files on King, which would supposedly show illegal activities, "debauchery", and plotting with communists.

The newsletter often makes unflattering references to black people without specific regard to King or the events of January 1987. For example, the March 1988 issue contained an apparent first-person account of a white prison inmate, who lamented the high incidence of homosexuality and AIDS among nonwhite inmates, especially "Negroes". As reported in June 1988, a 17-year-old white student introduced at a news conference by Barrett was allegedly beaten by "Negro gangs". In the October 1988 issue of the newsletter, the following appears:

DETROIT—Chrysler bragged that it employed more non-whites than Ford or GM. Within three years of increasing shoddy workmanship and white flight, the company went under, "resurrected" only by massive federal aid, robot assemblers and hi-tech. Manufacturers who still cling to the Yankee work ethic face the choice of: 1) moving to a white area where craftsmanship can be found (GM is moving to Tennessee), 2) moving to Japan (yellow is cheaper), 3) staying (and decaying) or giving up (Maytag said it would cease production if it had to hire minorities).

### GUARANTEED JOBS

Leftists say "Buy American" when they mean: accept minorities. The solution is to cancel quotas—remove minorities from the workforce—so jobs can return home now from overseas. * * *From the "Q & A" section in a March 1989 newsletter:

### WHAT IS "BLACK HISTORY" ANYHOW?

No such thing. Nary a wheel, building or useful tool ever emanated from non-white Africa. Africanization aims to set up a tyranny of minorities over Americans.

The newsletter also portrays Jews and Jewish groups in something less than a favorable light. According to an article in January 1988, headlined "Poinsett Debunks WW2 Gas Chamber Lies", Dr. Herbert Poinsett was "setting the record straight" that there was no mass extermination of Jews during World War II. As another example, from April 1988:

The Jews convict a retired Detroit auto-worker of "war-crimes" alleged before Israel even existed. President Reagan deports US citizens for death behind the Iron Curtain, at the behest of Jewish former Congresswoman Elizabeth Holtzman. Confessed Israeli spies are never even brought to trial.

### JEWISH LOBBY TO BLAME

With presidential candidates and Congressional leaders vowing support for Arab-land-grabber Israel, Tel Aviv newspapers lately called Capitol Hill: "The best little Congress money can buy." The Jewish Lobby even maintains an Enemies List of Americans.

Nationalists have long called for voluntary Jewish repatriation abroad; meanwhile, returning Arab lands, cutting off Israel's favors, shutting down the Jewish Lobby and curbing Wall Street could keep Uncle Sam from being Uncle Stooge.

The November 1988 newsletter referred to B'nai B'rith ADL as a "Jewish supremacist group" that was "founded to white-wash the 'reputation' of Jewish murderer Leo Frank." The July 1990 issue stated that the Anti-Defamation League—

recently called for Nationalists to be prosecuted and even killed for pamphleteering and exercising free speech.

### NATIONALISTS STAND UP TO PERSECUTION

ADL spokesman Simon Adler said in a news release from Hamilton, Canada, that Nationalists "must be stopped," in a thinly veiled bid for violence. Cohort, Gerald Swaye, head of the Jewish Federation, agreed that pro-majority activists must "pay the price," apparently even if killed by lawless street thugs. Another ADL supporter, Mark Silverberg, said in a tabloid interview that Nationalists should be compelled to "present them-selves in court" as a result of passing out leaflets which called on neigh-bors to "Stand on Guard" against minority crime.

Homosexuals are also newsletter editorial targets. Appear-ing in December 1988 was a call to prepare for a march on Washington, D.C., to take it back from those "Once called queers, then homosexuals, now 'gays' or alternative lifestylers":

Demand that queers be separated in society, removed from jobs and deprived of any power. Insist on AIDS testing, defrocking of pro-queer clergymen and quarantine of all AIDS patients. Patronize only Americans who honor family, women, home and children.

An article in July 1988 described a confrontation between Barrett, attempting to speak at a rally during the Demo-cratic National Convention, and a counterdemonstrating

crowd of "perverts" and "queers".[6] The August 1990 issue, reporting on petitioner's "Anti-Pervert Phone Drive" to obtain a telephone directory listing as a social service organization, described petitioner's objection to the listing of homosexual-oriented organizations as the giving of "immoral and unlawful" advice.

The newsletter also makes derogatory references to other groups of people. For example, the February 1989 issue contained a list of people who should be excluded from U.S. citizenship. Included on this list were "NON-AMERICANS: Boat people, wetbacks and aliens who are incompatible with American nationality and character, such as Nicaraguan refugees and Refusnik immigrants."

Since July 1989, one of petitioner's principal activities has been a prerecorded cable television program, a half hour in length, which is available for viewing weekly in several markets across the country. The program format of these "N-TV" productions is usually an interview conducted by Barrett, but occasionally he appears without a guest. Members are encouraged to recommend potential guests, and topics have included art, law and order, labor unions, physical fitness, skinheads, and pornography.

Although the programs are not scripted, interview questions are typically discussed with a guest in advance, with an eye toward emphasizing the guest's point of view. During the interview, Barrett sometimes strays from the topic either to inject an opinion or to ask a question related to petitioner's philosophy. The guests are usually not members of petitioner, but their responses to Barrett's questions are generally consistent with his viewpoints. The programs include a disclaimer at the end that the views expressed are not necessarily those of "the broadcaster or N-TV".

In terms of time spent by petitioner's staff, a primary activity for petitioner since mid-1990 has been so-called social service work, offered to the public through a telephone counseling service.[7] In this capacity, petitioner appears in the community service section of a Mississippi telephone

---

[6] An information sheet distributed by petitioner to supporters defines "Queers" as "Misfits, perverts, deviates * * *. All are good words for dramatic emphasis, on occasion. However, 'minority' is often better, less caustic."

[7] Petitioner also began to publicize a "free tip hotline" in 1990, consisting of recorded messages about current events, after which the caller could leave a message if desired.

book, under the heading "Counseling and Guidance". Providing a clearinghouse service for the most part, petitioner's volunteer counselors refer callers to various organizations, services, and governmental agencies. Some problems, however, are addressed through the reassurances and support of the counselors, without referrals. An attorney is on call to respond to legal questions, and Barrett himself takes referrals from the counselors, who have no apparent specialized training related to counseling. Callers, who are not routinely provided with petitioner's membership information or publications, are sometimes directed to petitioner's legal defense fund.

Petitioner's legal defense fund is itself a relatively important activity in terms of staff time. Emphasizing First Amendment issues, the legal defense fund supports petitioner and its individual members and has also defended its one-time affiliated organization, the Forsyth County Defense League (the FCDL).[8] Legal services are also available to the public, especially the poor.

Litigation adversaries have included the City of Natchez, Mississippi; the City of Cumming, Georgia; and Forsyth County, Georgia. Issues have included the right to peacefully assemble and speak, the right to petition the Government, and the right of corporations with minimal assets to commence legal actions without prepayment of court costs. In at least one case, the court awarded attorney's fees to petitioner. In litigation culminating in *Forsyth County v. Nationalist Movement*, 505 U.S. ____, 112 S. Ct. 2395 (1992), petitioner prevailed in its constitutional challenge of a county ordinance authorizing the imposition of an indefinite fee for assembling or parading.

Petitioner distributes descriptive price lists of audio cassettes (typically $8 for each 30 minutes of a speech, rally, or talk show), video cassettes (typically $29 or $35 for 30 minutes), books, pamphlets, and miscellaneous items such as flags. The accompanying order forms characterize the specified prices as "donations". Each issue of the monthly newsletter also has a "donation" order form for a short list of items which include flags, T-shirts, patches, and video cas-

---

[8] This entity, which was actually the forerunner of petitioner, was wound up and dissolved during the administrative process.

settes. All of the materials offered are closely connected with petitioner or its ideology, and for most of the audio and video cassettes (other than N-TV tapes), Barrett is the sole speaker or interviewee.

Most of the items that petitioner distributes in exchange for "donations" have been provided free to petitioner, many by Barrett. Barrett does not, however, receive any indirect compensation, such as royalties, when petitioner distributes the items. Funds received by petitioner for cassettes (other than N-TV tapes) and published materials are not substantial relative to other funding sources, which consist primarily of membership dues, newsletter subscriptions, and voluntary contributions.[9]

Petitioner's total receipts, net of loans, as reported to the IRS on Forms 1120 were $1,123 in 1987, $5,460 in 1988, $5,228 in 1989, and $2,165 in 1990. Claimed deductible expenditures, which have approximated receipts during this period, consist mostly of paper, other supplies, and expenses for printing, telephone, and postage. Petitioner does not compensate any officer or member, including Barrett. Barrett has personally made loans to petitioner on occasion, at no interest, including $3,600 in 1987.

Petitioner formally applied for exemption under section 501(c)(3) by filing Form 1023, dated December 5, 1987, with the IRS. Barrett was petitioner's representative throughout the administrative process. After several exchanges of correspondence, at least two telephone conferences, and three proposed adverse ruling letters, the IRS issued a final adverse ruling dated March 27, 1991, stating as the reasons:

> Your activities demonstrate that you are not operated exclusively for exempt charitable or educational purposes as required by section 501(c)(3). Furthermore, you are operated in furtherance of a substantial nonexempt, private purpose.

---

[9] During the administrative process, petitioner discontinued distribution of "The Commission" and those audio cassettes recorded by Barrett prior to the existence of petitioner. Less than 10 copies of the book had been distributed by petitioner.

*Discussion*

## I. *Introduction*

Section 501(a) generally exempts from Federal income taxation those organizations described in section 501(c), which includes corporations—

organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on behalf of (or in opposition to) any candidate for public office. [Sec. 501(c)(3).]

Contributions to organizations described in section 501(c)(3) are generally deductible to donors. Sec. 170(a)(1), (c)(2).

Largely through constitutional arguments, petitioner here disputes respondent's determination that it does not qualify for exemption under section 501(c)(3). Petitioner also maintains that, consistent with section 501(c)(3), it operates exclusively for charitable and educational purposes.

The facts and the administrative development of this case raise or suggest several issues that we do not here consider. For example, respondent explicitly abandons on brief an earlier administrative position that petitioner is an "action" organization pursuing legislation, a status that would preclude exemption. See sec. 1.501(c)(3)–1(c)(3), Income Tax Regs. In addition, respondent does not contend that petitioner's ideas or its membership policies are invidiously discriminatory and thus contrary to public policy, although the IRS early in the administrative process challenged petitioner's membership policies on that ground. See *Bob Jones Univ. v. United States,* 461 U.S. 574 (1983); *Church of Scientology of California v. Commissioner,* 83 T.C. 381, 502–509 (1984), affd. 823 F.2d 1310 (9th Cir. 1987). Respondent also has not attempted on brief to invoke certain standards arguably applicable to organizations with publishing activities. See Rev. Rul. 77–4, 1977–1 C.B. 141; Rev. Rul. 67–4, 1967–1 C.B. 121.[10]

---

[10] Understandably, respondent does not argue that "donations" to petitioner for tangible goods are nondeductible quid pro quo payments, in whole or in part, under sec. 170. See *Hernandez*

## II. *Preliminary Matters*

The function of the Court in a declaratory judgment proceeding under section 7428 is ordinarily limited to a review of the administrative determination, with the petitioner having the burden of proof. Rule 217(c)(2)(A); *Church in Boston v. Commissioner*, 71 T.C. 102, 105 (1978). In performing our limited role, we generally consider only the facts and evidence contained in the administrative record. *Houston Lawyer Referral Serv., Inc. v. Commissioner*, 69 T.C. 570, 574–575 (1978). A party may introduce evidence not contained in the administrative record, but only if the Court grants permission upon good cause shown. Rule 217(a).

Petitioner attached an 87-page appendix to its answering brief, which prompted respondent to file a motion to strike both certain items in the appendix and references to those items in the textual body of the brief. The essence of respondent's objection is that the appendix contains materials not in the administrative record, including newspaper and magazine excerpts and publications distributed by apparently exempt organizations.

Petitioner filed a response to respondent's motion to strike, maintaining that it is not in violation of Rule 217(a). The grounds for this position are, first, that the appendix is a "Brandeis Brief" helpful to the Court in reaching a just result and, second, that the appendix is complementary to the administrative record. Petitioner also filed, in the alternative, a motion to supplement the administrative record, essentially incorporating the same grounds.

The so-called Brandeis brief, whose name derives from the brief authored by eventual Supreme Court Justice Louis Brandeis in *Muller v. Oregon*, 208 U.S. 412 (1908), is a brief "in which economic and social surveys and studies are included along with legal principles and citations". Black's Law Dictionary 188 (6th ed. 1990).[11] This Court has recently

---

*v. Commissioner*, 490 U.S. 680 (1989), affg. 819 F.2d 1212 (1st Cir. 1987), and *Graham v. Commissioner*, 822 F.2d 844 (9th Cir. 1987), affg. 83 T.C. 575 (1984); *United States v. American Bar Endowment*, 477 U.S. 105 (1986). Deductibility of contributions is not an issue unless petitioner first establishes its exempt status under sec. 501(c)(3).

[11] In its historical context—

The purpose of the social science brief, or "Brandeis Brief," was to convince the [Supreme] Court that social science data existed that justified the statute at issue and thus would make it pass muster under a test of reasonableness. This kind of evidence was particularly valuable during the era of substantive due process, for in that period the Court determined a statute's constitu-

voiced its unwillingness to consider Brandeis briefs at the trial level. See *Snyder v. Commissioner*, 93 T.C. 529, 533–534 (1989). Although petitioner here raises constitutional issues, with which Brandeis briefs are commonly associated, and we are not acting as a de novo trial court in this proceeding, these differences from the circumstances in *Snyder* do not change our thinking. Accepting petitioner's appendix as a Brandeis brief would undermine the rationale and result in *Nationalist Movement v. Commissioner*, T.C. Memo. 1992–698, in which we denied petitioner's motion to compel discovery after completion of the administrative process.

Petitioner argues that the appendix materials are relevant to petitioner's arguments involving respondent's conduct toward other organizations, and are complementary to the administrative record. However, although we did not decide the merits of petitioner's arguments regarding disparate treatment in *Nationalist Movement v. Commissioner, supra*, we there stated:

> Petitioner has failed to show why it could not have raised this issue during the administrative stage of this case and thus have developed the administrative record in support of its allegation. * * * Petitioner has failed to show that it had neither the opportunity nor the ability to develop at the administrative stage its claim of disparate treatment. * * *

That rationale is no less apt here.

In sum, petitioner has not persuaded us that it is in compliance with the general constraints of Rule 217(a), nor has petitioner shown good cause to supplement the administrative record. Accordingly, respondent's motion to strike will be granted, and petitioner's motion to supplement the administrative record will be denied. We note that respondent has declined to object specifically to certain portions of petitioner's appendix, including responses to respondent's proposed findings of fact under Rule 151(e)(3). The parts of the appendix that are apparently acceptable to respondent will not be stricken.

Respondent attached an even longer appendix to her opening brief, consisting of unofficial transcripts of the audio and video cassettes in the administrative record. Although we

---

tionality by inquiring into its substantive reasonableness. The Brandeis Brief distinguishes adjudicative facts, which are established in the court, from legislative facts, data upon which the legislature relied, or could have relied, in drafting its statute. * * * [Hovenkamp, "Social Science and Segregation before *Brown*", 1985 Duke L.J. 624, 628 n.15 (1985).]

have no pending motion from petitioner concerning respondent's appendix, petitioner contends on brief that the transcripts contain many inaccuracies. For our part, we have listened to and viewed the actual tapes and have not assigned any independent evidentiary significance to respondent's transcripts.

## III. *Public Versus Private Interest*

An organization does not operate exclusively for exempt purposes if it more than incidentally serves a private interest, such as that of the creator or designated individuals, rather than a public interest. Sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs.; see *Kentucky Bar Found., Inc. v. Commissioner*, 78 T.C. 921, 926 (1982). This broad "private interest" restriction draws upon some of the same considerations as the explicit requirement in section 501(c)(3) that an exempt organization have "no part of the net earnings * * * [inuring] to the benefit of any private shareholder or individual". *Retired Teachers Legal Defense Fund v. Commissioner*, 78 T.C. 280, 286–287 (1982); *Goldsboro Art League, Inc. v. Commissioner*, 75 T.C. 337, 345 & n.10 (1980).

With reliance on *Christian Manner Intl. v. Commissioner*, 71 T.C. 661 (1979), and *Save the Free Enter. Sys., Inc. v. Commissioner*, T.C. Memo. 1981–388, respondent contends that petitioner's main purpose is to serve a private interest by supplying a forum for Barrett to express and promote his personal agenda. We believe, however, that these cases are readily distinguishable. Substantial domination of an organization by its founder does not necessarily disqualify the organization from exemption. *Church of Vis. Intell. That Governs Universe v. United States*, 4 Cl. Ct. 55, 62 (1983); see *Bubbling Well Church v. Commissioner*, 74 T.C. 531, 535 (1980), affd. 670 F.2d 104 (9th Cir. 1981).

In *Save the Free Enter. Sys., Inc. v. Commissioner, supra,* the ostensible purposes of the organization centered around the preservation and advancement of the free enterprise system, largely through public awareness and participation. We ultimately concluded that the organization served a private interest, thereby foreclosing exempt status, in that a substantial purpose was to advance the personal attacks of the organization's president toward various agencies and

institutions. We summarized that "Most of the information in the administrative record repeatedly refers to * * * [his] purported persecution by these groups and his legal action against them." *Id.* Although Barrett in his various capacities with petitioner sometimes draws upon and relates his personal experiences, the administrative record in the instant case does not suggest anywhere near the same kind or degree of retaliatory personal attack.

In *Christian Manner Intl. v. Commissioner, supra,* we concluded that a purportedly religious and educational organization was not operated exclusively for exempt purposes under section 501(c)(3). We first found that the organization's primary activity was the distribution, promotion, and sale of books written by its sole employee, the president. *Id.* at 666–667. We further determined that "the actual purpose for the organization * * * was to publish * * * [his] books and provide him with an outlet for the exposition of his theories on 'the end of time.' " *Id.* at 669.

Respondent argues that Barrett's status with petitioner similarly provides him with a captive forum for widespread dissemination of his personal views. What respondent fails to acknowledge, however, is our emphasis in *Christian Manner Intl.* on the commercial nature of the book activity. We there stated that "the principal purpose served was commercial in nature and for the private benefit" of the employee, *id.*, and we later expanded on the commercial aspects without further specific reference to the significance of a ready "outlet", *id.* at 670. The administrative record here does not indicate a similar pervading commercialism surrounding petitioner's activities, nor is there any evidence of personal financial gain to Barrett or anyone else associated with petitioner.

Respondent also asserts that petitioner operates for Barrett's private benefit by promoting his personal career ambitions in politics. The record does not support respondent's position. Although Barrett's political ambitions were evident when he ran for the Mississippi legislature in 1970 and for the governorship in 1980, we see nothing in the record suggesting current ambitions along these lines.

## IV. *Specific Activities and the Operational Test*

To come within the terms of section 501(c)(3), an organization must operate "exclusively" for tax-exempt purposes. This does not mean, however, "solely" or "absolutely without exception". *Church in Boston v. Commissioner*, 71 T.C. at 107. Nonetheless, the presence of a single substantial nonexempt purpose precludes exempt status for the organization, regardless of the number or importance of the exempt purposes. *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945); *Copyright Clearance Ctr., Inc. v. Commissioner*, 79 T.C. 793, 803–804 (1982). Actual purposes, not necessarily limited to those stated in the organizing documents, are the appropriate focus. *American Campaign Academy v. Commissioner*, 92 T.C. 1053, 1064 (1989).

As stated in the regulations, the "operational test" is as follows:

An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish . one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. [Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs.]

The purposes toward which an organization directs its activities, and not the nature of the activities themselves, determine whether the organization meets the operational test. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978).

Of the exempt purposes listed in section 501(c)(3), petitioner maintains that it operates primarily for charitable purposes and secondarily for educational purposes.

### A. *Charitable Purpose*

The term "charitable" is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimina-

tion; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency. * * * [Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs.]

Petitioner has consistently argued that its activities, in one way or another, touch on virtually all of the charitable categories listed in section 1.501(c)(3)–1(d)(2), Income Tax Regs. Our concern under the operational test, however, is not how diverse petitioner's allegedly charitable activities are, but whether petitioner engages primarily in activities that accomplish exempt purposes. See *Columbia Park & Recreation Association v. Commissioner*, 88 T.C. 1, 27 (1987), affd. without published opinion 838 F.2d 465 (4th Cir. 1988); sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. Toward the end of the administrative process, petitioner estimated that its purportedly charitable activities of social service work and legal work consumed nearly half of its staff time.[12] On brief, petitioner refers to these two as its "principal" activities.

Petitioner considers its social service work to consist of, at least largely, its telephone counseling line begun in 1990. Respondent has published several rulings concluding that personal counseling serves exempt educational purposes. See, e.g., Rev. Rul. 78–99, 1978–1 C.B. 152; Rev. Rul. 74–595, 1974–2 C.B. 164; Rev. Rul. 73–569, 1973–2 C.B. 178. If truly for exempt purposes, whether petitioner's counseling is considered charitable or educational is not important; qualification under section 501(c)(3) is not dependent upon how appropriately the organization categorizes its purposes. Sec. 1.501(c)(3)–1(d)(1)(iii), Income Tax Regs.

The record is vague and inconsistent concerning petitioner's purported social service work. Petitioner initially wrote the IRS that calls for counseling services through September 1990 numbered "Up to approximately 30 per day". When subsequently asked, in December 1990, for the number of "social service work" inquiries received per month, petitioner wrote in reply: "Approximately in excess of 100". When asked whether it advertised its social services other than in the local yellow pages, petitioner wrote in response a simple "Yes", with no elaboration on where, when, or how. When asked about any special training either provided to or pos-

---

[12] Petitioner's full list of estimates is as follows: Social service, 25 percent; legal (First Amendment), 20 percent; TV, broadcasting, 20 percent; administration, 10 percent; publishing, 10 percent; forums, speeches, 5 percent; classes, training, 5 percent; and miscellaneous, 5 percent.

sessed by staff members, petitioner wrote that there was indeed special training, referring to written "Counseling Guidelines" as support. These guidelines, contained within a single page, neither mention nor imply the need for any special training. Still on the subject of special training, petitioner also wrote that incoming calls are "largely" referred to Barrett, a practicing attorney with college credits in psychology, education, and "related fields".

Petitioner has the burden of proof on those grounds set forth in respondent's final adverse ruling, which include a failure to operate exclusively for exempt purposes. Rule 217(c)(2)(A). Petitioner must supply sufficient information about its principal activities to warrant a conclusion that it operates in furtherance of exempt purposes. *La Verdad v. Commissioner*, 82 T.C. 215, 219–221 (1984); *World Family Corp. v. Commissioner*, 81 T.C. 958, 966 (1983). Factual shortcomings and inconsistencies in the administrative record will not relieve petitioner of its burden. *Basic Bible Church v. Commissioner*, 74 T.C. 846, 854–855 (1980), affd. sub nom. *Granzow v. Commissioner*, 739 F.2d 265 (7th Cir. 1984); *General Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 930–932 (1979); *Church in Boston v. Commissioner*, 71 T.C. at 106–107. Petitioner has not established that its social service counseling accomplishes or will accomplish exempt purposes.

Within the definition of "charitable" is the promotion of social welfare through the defense of human and civil rights secured by law. *Retired Teachers Legal Defense Fund v. Commissioner*, 78 T.C. at 288; sec. 1.501(c)(3)–1(d)(2), Income Tax Regs. Unlike telephone counseling, petitioner's legal work, which emphasizes constitutional issues, has been an ongoing and important activity throughout petitioner's corporate existence. Moreover, petitioner provides free legal assistance on occasion to the poor, and relief of the poor is considered a charitable purpose. Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs.; see Rev. Rul. 78–428, 1978–2 C.B. 177.

In most of the litigation undertaken, however, petitioner itself, rather than an individual, has been the party in interest. In essence, petitioner has often engaged in litigation to protect its own interests, though such litigation may have broader implications. As a notable example, petitioner recently prevailed in a Supreme Court case, *Forsyth County*

*v. Nationalist Movement,* 505 U.S. ____, 112 S. Ct. 2395 (1992), which began early in 1989 when Forsyth County subjected petitioner's planned rally to a $100 fee.[13] Petitioner has also engaged in litigation that apparently ended well short of the Supreme Court.

As part of its correspondence with the IRS, petitioner listed several First Amendment cases in which it or its one-time affiliate, the FCDL, had been a party. One such listing was as follows: "To secure the right of citizens to peacefully assemble (TNM v. Cumming, 1990)." On brief, petitioner identifies the courts that had jurisdiction over these cases, but, apart from *Forsyth County v. Nationalist Movement, supra,* petitioner does not offer a formal legal citation for any of them.

Despite the clear implication that any opinions in these cases were unpublished, petitioner has not been deterred from offering grandiose descriptions of its legal accomplishments. In an April 1989 letter to the IRS, petitioner referred to winning an unspecified "civil rights' [sic] lawsuit against a municipality who had denied local citizens their right to assemble in public", a description consistent with litigation involving the City of Natchez. In prevailing, according to petitioner, "we advanced the civil and constitutional rights of all Americans." Elsewhere in the same letter, petitioner stated: "We recently won an historic legal case in which we assured that the poor are not compelled to pay certain court costs." Similarly, petitioner earlier had informed the IRS of a "landmark ruling" in Mississippi Federal court benefiting "all the poor and underprivileged everywhere."

On brief, petitioner counts among its many "contributions to the nation's jurisprudence" in the "public interest"—

the extension of the rights of citizens to peacefully assemble, the right of citizens to petition the government, the right of citizens to speak in public, the right of the poor to exercise their First Amendment rights, the access of the poor to the courts and the right of those exercising First Amendment rights to be free from intimidation.

Petitioner also states on brief that its legal activities "materially benefit * * * all of the American People."

---

[13] We recognize that the Supreme Court resolution of this case is not a part of the administrative record before us. Nonetheless, the controversy and some lower court activity are mentioned in the record. In these circumstances, we take judicial notice of the culmination of the litigation.

Admittedly, even an unpublished decision can have implications beyond the immediate parties, such as when the decision compels a governmental entity to alter its enforcement or administrative practices. Here, however, petitioner provides very little detail about its litigation, so for any given case (other than petitioner's case in the Supreme Court) we have no way of knowing the precise constitutional issues raised, petitioner's expectations about public impact, the rationale of the decision, the type and scope of relief, and the potential implications to the public. Cf. Rev. Proc. 92–59, 1992–2 C.B. 411, 411–412 (public interest law firms seeking exemption rulings should show a "broad public interest" and should annually file "a description of cases litigated and the rationale for the determination that they would benefit the public generally"); Chisolm, "Exempt Organization Advocacy: Matching the Rules to the Rationales", 63 Ind. L.J. 201, 210–214, 285–287 (1987).[14]

Consequently, petitioner has failed to prove that its legal activities are in furtherance of charitable purposes. Cf. *San Francisco Infant School v. Commissioner*, 69 T.C. 957, 964–966 (1978) (activity that was "vehicle for or incidental to" exempt purpose did not disqualify exemption); Rev. Rul. 80–278, 1980–2 C.B. 175 (environmental litigation furthered exempt purposes and was reasonably related to accomplishment of such purposes).

## B. *Educational Purpose*

### 1. *Constitutional Issues*

Petitioner, which devotes most of its briefs to constitutional arguments, maintains that the following revenue rulings and revenue procedure relied upon by the IRS during the administrative process are unconstitutional, both facially and as applied: Rev. Proc. 86–43, 1986–2 C.B. 729 (sometimes referred to herein as the revenue procedure); Rev. Rul. 68–263, 1968–1 C.B. 256; Rev. Rul. 66–256, 1966–2 C.B. 210; and Rev. Rul. 62–71, 1962–1 C.B. 85. All four relate to whether an organization is tax exempt under section

---

[14] Although petitioner's newsletter often refers to the successful endeavors of the legal defense fund, it fails to communicate even the barest essentials of the cases. Cf. *National Association for Alternative Schools v. Commissioner*, 71 T.C. 118, 123–124 (1978) (exempt organization supplied public with copies of briefs filed in lawsuits involving alternative schools).

501(c)(3). With reliance on the 1st, 5th, and 14th Amendments, petitioner asserts that these revenue rulings and revenue procedure are vague and overbroad in that, first, they do not give proper notice as to the nature of the proscribed conduct or speech, and second, they are susceptible of application in an unreasonable, arbitrary, and capricious manner. These alleged shortcomings, according to petitioner, unreasonably inhibit or infringe First Amendment rights.

Respecting petitioner's claims of vagueness and overbreadth, we will limit our consideration to Rev. Proc. 86–43, *supra*, which addresses whether advocacy by an organization is educational within the meaning of section 501(c)(3). Rev. Rul. 62–71, *supra*, concludes that the subject organization is an "action" organization not eligible for exemption, a position already abandoned in this case by respondent. The remaining two revenue rulings are, in our view, subsumed in the revenue procedure, and nothing would be gained by according them independent significance.

a. *Background of Rev. Proc. 86–43*

The regulation at the focus of petitioner's constitutional arguments is section 1.501(c)(3)–1(d)(3)(i), Income Tax Regs., which provides:

(3) *Educational defined*—(i) *In general.* The term "educational", as used in section 501(c)(3), relates to—

(a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or

(b) The instruction of the public on subjects useful to the individual and beneficial to the community.

An organization may be educational even though it advocates a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts as to permit an individual or the public to form an independent opinion or conclusion. On the other hand, an organization is not educational if its principal function is the mere presentation of unsupported opinion.[15]

*Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C. Cir. 1980), which involved a feminist-oriented organization that published a monthly newspaper as its primary activity, addressed the constitutionality of the regulation. The court

---

[15] For a detailed history of the educational exemption as administered by the IRS, see Thompson, "The Availability of the Federal Educational Tax Exemption for Propaganda Organizations", 18 U.C. Davis L. Rev. 487 (1985).

there concluded that the regulation is unconstitutionally vague in violation of the First Amendment, in part because the "full and fair exposition" standard is too imprecise to engender objective application. *Id.* at 1039. In so holding, the court rejected proposals calling for "objective" line-drawing between unsupported opinion and fact and between emotional appeals and appeals to the mind. *Id.* at 1038–1039.[16]

The same court later considered the exempt status of an organization concerned with preserving the racial and cultural heritage of white Americans of European ancestry. In *National Alliance v. United States*, 710 F.2d 868 (D.C. Cir. 1983), the court focused on membership bulletins and monthly newsletters, concluding that the material did not fit within any reasonable interpretation of the statutory term "educational", regardless of the constitutionality of the regulation.

Later still, in section 3 of Rev. Proc. 86–43, *supra*, the IRS set forth the criteria to be used in determining whether advocacy is educational under section 501(c)(3):

.01 The Service recognizes that the advocacy of particular viewpoints or positions may serve an educational purpose even if the viewpoints or positions being advocated are unpopular or are not generally accepted.

.02 Although the Service renders no judgment as to the viewpoint or position of the organization, the Service will look to the method used by the organization to develop and present its views. The method used by the organization will not be considered educational if it fails to provide a factual foundation for the viewpoint or position being advocated, or if it fails to provide a development from the relevant facts that would materially aid a listener or reader in a learning process.

.03 The presence of any of the following factors in the presentations made by an organization is indicative that the method used by the organization to advocate its viewpoints or positions is not educational.

1 The presentation of viewpoints or positions unsupported by facts is a significant portion of the organization's communications.

2 The facts that purport to support the viewpoints or positions are distorted.

3 The organization's presentations make substantial use of inflammatory and disparaging terms and express conclusions more on the basis of strong emotional feelings than of objective evaluations.

---

[16] The Tax Court considered the alleged unconstitutional vagueness of regulations under sec. 501(c)(3) in *Retired Teachers Legal Defense Fund v. Commissioner*, 78 T.C. 280 (1982). We there rejected the taxpayer's arguments and upheld, among other provisions, the general definition of "educational" in sec. 1.501(c)(3)–1(d)(3), Income Tax Regs. *Id.* at 284–285. The "full and fair exposition" standard, however, was not in issue. *Id.* at 284 & n.6.

4 The approach used in the organization's presentations is not aimed at developing an understanding on the part of the intended audience or readership because it does not consider their background or training in the subject matter.

.04 There may be exceptional circumstances, however, where an organization's advocacy may be educational even if one or more of the factors listed in section 3.03 are present. The Service will look to all the facts and circumstances to determine whether an organization may be considered educational despite the presence of one or more of such factors.

[Rev. Proc. 86–43, 1986–2 C.B. at 729–730.]

The four factors in section 3.03 of the revenue procedure had earlier been the foundation of an IRS "methodogy test" which was advanced during the course of the *National Alliance* litigation as an elaboration of the "full and fair exposition" standard previously deemed unconstitutionally vague in *Big Mama Rag, Inc. v. United States, supra. National Alliance v. United States, supra* at 870, 874. The court in *National Alliance* had found it unnecessary to resolve whether the methodology test would cure the vagueness of the regulation. *Id.* at 875–876.

b. *Constitutionality of Rev. Proc. 86–43*

Despite the apparent similarity between petitioner and the organization in *National Alliance*, we decline to decide this case based on an analysis of whether petitioner was educational within any reasonable interpretation of the statutory term, which was the approach utilized by the court in *National Alliance*. At the time the *National Alliance* case was decided, the methodology test was merely an argument raised by the IRS in the context of that litigation. *Id.* at 870. In contrast, the methodology test subsequently has been published as Rev. Proc. 86–43, *supra*. Although revenue procedures are not binding on this Court, *Estate of Lang v. Commissioner*, 64 T.C. 404, 406–407 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980), they do constitute official statements of IRS procedure. Rev. Proc. 89–14, 1989–1 C.B. 814. Accordingly, we cannot avoid, as did the court in *National Alliance,* considering the constitutionality of the revenue procedure's methodology test as applied by respondent to petitioner.

The essence of petitioner's argument is that, by denying tax exemption, respondent is attempting to suppress ideas with which she does not agree. Petitioner further contends

that its viewpoints are constitutionally protected as commentary on issues of public concern.

Denial of a tax exemption for engaging in speech consisting of "dangerous ideas" can be a discriminatory limitation on free speech. *Speiser v. Randall*, 357 U.S. 513, 519 (1958) (quoting *American Communications Association v. Douds*, 339 U.S. 382, 402 (1950)); see *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983). A nondiscriminatory denial of a tax benefit, however, not aimed at suppressing speech content, does not infringe First Amendment rights. *Cammarano v. United States*, 358 U.S. 498, 512–513 (1959) (nondeductibility of lobbying expenses). Tax exemption is a privilege derived from legislative grace, not a constitutional right. *Christian Echoes Natl. Ministry, Inc. v. United States*, 470 F.2d 849, 857 (10th Cir. 1972); *General Conf. of the Free Church v. Commissioner*, 71 T.C. at 931. The Supreme Court has rejected "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Cammarano v. United States, supra* at 515 (Douglas, J., concurring); see *Regan v. Taxation with Representation of Wash., supra* at 546, 548; *Haswell v. United States*, 205 Ct. Cl. 421, 447, 500 F.2d 1133, 1148 (1974).

The constitutional foundation of the void-for-vagueness doctrine is due process, which requires, first, fair notice of proscribed conduct and, second, explicit standards for Government officials who might otherwise engage in arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 & nn.3–4 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). The Supreme Court has expressed greater tolerance for laws with civil rather than criminal sanctions because of the relative severity of the consequences. See, e.g., *Kolender v. Lawson*, 461 U.S. 352, 358–359 n.8 (1983); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–499 (1982). However, because of the potential chilling effect on constitutionally protected expression, the doctrine "demands a greater degree of specificity" in its First Amendment applications. *Smith v. Goguen*, 415 U.S. 566, 573 (1974); see *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

Under the overbreadth doctrine in the context of the First Amendment, a court may find a law void on its face for

sweeping too broadly and thereby restricting or punishing speech that is constitutionally protected. See, e.g., *Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987). Because an overly broad law may inhibit free speech, even a party whose speech would be legitimately subject to regulation under a narrower law may have standing to assert the rights of others. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985); *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798–799 (1984). The overbreadth must be substantial relative to the legitimate sweep of a law, however, before invalidation is appropriate. *New York v. Ferber*, 458 U.S. 747, 770–771 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Under one branch of the overbreadth doctrine, a law may be void for granting overly broad discretion to a decisionmaker, such as a licensing authority or a police officer. See, e.g., *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988); *Houston v. Hill*, 482 U.S. 451 (1987). In this type of situation, "every application creates an impermissible risk of suppression of ideas". *Forsyth County v. Nationalist Movement*, 505 U.S. at ____, 112 S. Ct. at 2401; see *Lakewood v. Plain Dealer Pub. Co., supra* at 759. A law granting excessive licensing discretion fosters a threat of official censorship that may intimidate people into censoring their own speech. *Secretary of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 964 n.12 (1984); *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

Petitioner makes clear that its main constitutional objection to Rev. Proc. 86–43, 1986–2 C.B. 729, is excessive administrative discretion, which is an analytical link between the doctrines of vagueness and overbreadth. Indeed, the two are "logically related and similar doctrines." *Kolender v. Lawson, supra* at 358–359 n.8; see Tribe, American Constitutional Law, sec. 12–31 (2d ed. 1988); Fallon, "Making Sense of Overbreadth", 100 Yale L.J. 853, 903–907 (1991). Our analysis, accordingly, does not follow two separate paths.

Our starting point is *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1034 (D.C. Cir. 1980), in which the court, prior to publication of the revenue procedure, held the "full and fair exposition" standard in section 1.501(c)(3)–1(d)(3)(i), Income Tax Regs., unconstitutionally vague. We note first that the same court later spoke approvingly, albeit in dictum,

about the informal methodology test that served as the fore-runner of the published revenue procedure:

starting from the breadth of terms in the regulation, application by IRS of the Methodology Test would move in the direction of more specifically requiring, in advocacy material, an intellectually appealing development of the views advocated. The four criteria tend toward ensuring that the educational exemption be restricted to material which substantially helps a reader or listener in a learning process. The test reduces the vagueness found by the *Big Mama* decision. [*National Alliance v. United States*, 710 F.2d at 875.]

This positive view of the methodology test, and hence the revenue procedure, does not appear to be inconsistent with the reasoning in *Big Mama Rag*. The court in the latter case was concerned that the standard in section 1.501(c)(3)–1(d)(3), Income Tax Regs., seemed to incorporate the individualistic and unascertainable reactions of members of the public. *Big Mama Rag, Inc. v. United States, supra* at 1037 (citing principally *Coates v. City of Cincinnati*, 402 U.S. 611 (1971)). The revenue procedure, however, is not phrased in terms of individual sensitivities similar to those in Coates, which involved an ordinance prohibiting sidewalk conduct "annoying to persons passing by". *Id.*; see Tribe, *supra* sec. 12–32, at 1036. The court was also troubled by the uncertainty surrounding the disqualifying degree of "unsupported opinion"; namely, whether it had to be the "principal function" of the organization. *Big Mama Rag, Inc. v. United States, supra* at 1037 (quoting sec. 1.501(c)(3)–1(d)(3)(i), Income Tax Regs.). The revenue procedure now clarifies that viewpoints unsupported by facts may preclude an educational purpose if such presentations constitute a "significant portion of the organization's communications", even if such presentations are not the organization's principal function. Rev. Proc. 86–43, 1986–2 C.B. at 730.

Petitioner apparently reads the revenue procedure to require organizations to present and rebut opposing views, and it is certainly true that such a presentation does not detract from educational status. See *National Association for Alternative Schools v. Commissioner*, 71 T.C. 118, 123–124 (1978) (providing public with litigation documents filed by opposing parties was appropriate method of presenting "full and fair exposition"). The revenue procedure, however, does not by its terms require this type of presentation, and we see

this omission as tending to lessen administrative discretion.[17] Because the IRS does not condition educational status under the revenue procedure on the presentation of opposing views, the IRS is not called upon to evaluate how accurately or completely an organization presents such views.

Petitioner also contends that the discretion for "exceptional circumstances" granted the IRS in section 3.04 of the revenue procedure is a factor that aggravates the unconstitutionality. Petitioner's interpretation of the provision is that the IRS may reject tax exemption "on its own whim" if an organization "does not curry its favor." Contrary to petitioner's reading, however, this provision is clearly written as a second chance for an organization that fails one or more of the specific standards. In other words, the exercise of IRS' discretion can only resurrect tax exemption, not displace it. If anything, then, the provision appears to favor respondent's constitutional defense of the revenue procedure. See *Secretary of State of Md. v. J.H. Munson Co., supra* at 962–968 (although not enough to save overbroad statute, administrative discretion to waive restriction did not adversely affect constitutionality); *id.* at 983 n.3 (Rehnquist, J., dissenting) (waiver provision "extremely significant as tending to decrease overbreadth"); *National Found. v. City of Fort Worth*, 415 F.2d 41, 46 (5th Cir. 1969).

We are also not impressed with the authority cited by petitioner in support of its constitutional arguments. Petitioner extensively cites *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988), in which the Court concluded that a city ordinance regulating the placement of newsracks was unconstitutionally overbroad. The ordinance gave the mayor authority to grant or deny applications for annual permits, provided that reasons be stated for a denial; also, any permit issued was subject to, among other things, "terms and conditions deemed necessary and reasonable by the Mayor." *Id.* at 753–754. The instant case clearly does not involve anything similar to the degree of "unbridled" and "unfettered" discretion found in *Lakewood*. See *id.* at 755, 757, 770, 772.

---

[17] It is also doubtful whether such a requirement would be appropriate even apart from vagueness and overbreadth considerations. See *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1039 n.18 (D.C. Cir. 1980); Thompson, "The Availability of the Federal Educational Tax Exemption for Propaganda Organizations", 18 U.C. Davis L. Rev. 487, 510 n.48, 527 n.89 (1985).

Petitioner also relies heavily on *Federal Election Commn. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986), as authority for the proposition that the revenue procedure "as applied" to petitioner is unconstitutional. There, a Federal statute restricted the corporate use of treasury funds to make expenditures in connection with Federal elections. The Court first concluded that the corporation was in violation of the statute, but then held that the statute was unconstitutional as applied in that it infringed protected political speech of the corporation without a compelling justification for the infringement. *Id.*

That case involved neither section 501(c)(3) specifically nor tax exemption generally. Indeed, the Court distinguished a situation in which a corporation might be ineligible to receive deductible contributions: "Such a result * * * would infringe no protected activity, for there is no right to have speech subsidized by the Government." *Id.* at 256 n.9. Further, the case is an example of Government regulation on the basis of speech content, which is the underlying premise for the required compelling justification. See *Boos v. Barry*, 485 U.S. 312, 321 (1988); Fallon, "Making Sense of Overbreadth", 100 Yale L.J. 853, 865 (1991). As we conclude below, the revenue procedure has only a minimal risk of being applied to favor or disfavor certain types of speech content.

Elsewhere, the Supreme Court has acknowledged that one consideration in a vagueness challenge is whether it would have been practical to draft more precisely. See *United States Civil Serv. Commn. v. National Association of Letter Carriers*, 413 U.S. 548, 578–579 (1973) ("there are limitations in the English language with respect to being both specific and manageably brief"); *United States v. Petrillo*, 332 U.S. 1, 7–8 (1947); see also *Kolender v. Lawson*, 461 U.S. at 361; Tribe, American Constitutional Law, sec. 12–31, at 1034 (2d ed. 1988); Note, "The Void-for-Vagueness Doctrine in the Supreme Court", 109 U. Pa. L. Rev. 67, 95 n.150 (1960). Congress did not intend the word "educational" in section 501(c)(3) to embrace every ongoing dissemination of information, *National Alliance v. United States*, 710 F.2d at 873, and the term is not easily defined with precision, *id.*; *Big Mama Rag, Inc. v. United States*, 631 F.2d at 1035, 1040.

In our view, Rev. Proc. 86–43, 1986–2 C.B. 729, is not unconstitutionally vague or overbroad on its face, nor is it

unconstitutional as applied. Its provisions are sufficiently understandable, specific, and objective both to preclude chilling of expression protected under the First Amendment and to minimize arbitrary or discriminatory application by the IRS. The revenue procedure focuses on the method rather than the content of the presentation. In contrast, it was the potential for discriminatory denials of tax exemption based on speech content that caused the Court of Appeals for the District of Columbia Circuit to hold that the vagueness of the "full and fair exposition" standard violates the First Amendment. *Big Mama Rag., Inc. v. United States, supra* at 1034 & n.7, 1040 & n.19; see *National Alliance v. United States, supra.* Petitioner has not persuaded us that either the purpose or the effect of the revenue procedure is to suppress disfavored ideas. See *Regan v. Taxation with Representation of Wash.,* 461 U.S. at 548.

## 2. *Newsletter as Educational*

Petitioner maintains on brief that its principal educational activities are "discussions, forums and television interviews". Perhaps not coincidentally, this description is similar to an example in the regulations of an organization deemed educational. See sec. 1.501(c)(3)–1(d)(3)(ii), *Example (2),* Income Tax Regs.; see also Rev. Rul. 76–4, 1976–1 C.B. 145 (production of noncommercial cable television programs was for educational purpose). In a departure from its position during the administrative process, petitioner has downgraded the status of its monthly newsletter. Because circulation is restricted to members and nonmember subscribers, asserts petitioner, there is no real intention to educate the general public. See *Phi Delta Theta Fraternity v. Commissioner,* 90 T.C. 1033 (1988), affd. 887 F.2d 1302 (6th Cir. 1989); *National Association for Alternative Schools v. Commissioner,* 71 T.C. at 122. Petitioner also now argues that the newsletter is an "insubstantial part" of its activities, partly because of the small number of people who receive it.

Whether an activity is substantial is a facts-and-circumstances inquiry not always dependent upon time or expenditure percentages. *Manning Association v. Commissioner,* 93 T.C. 596, 610-611 (1989); *Church in Boston v. Commissioner,* 71 T.C. at 108. In these circumstances, we are

not persuaded that publication and distribution of petitioner's newsletter is an insubstantial activity. The newsletter apparently has been published continually since petitioner's incorporation in mid-1987, and Barrett, petitioner's chairman and chief spokesperson, has served as editor since 1988. In addition to editorial commentary, the newsletter covers virtually all types of news and events that are important to petitioner, including rallies, conventions, broadcast media appearances, and litigation. Use of the postal system facilitates geographically wide dissemination, and subscriptions are a source of funding. The newsletter is also one of only two activities, social service being the other, that petitioner has singled out as requiring a disproportionately large share of petitioner's monthly expenditures.[18]

Moreover, the record reveals that petitioner does not confine its newsletter to a restricted readership. The November 1988 issue encouraged readers to "Order and distribute" extra copies, and the March 1989 issue referred approvingly to copies being "handed out on streets". Free copies are available to broad categories of people, such as the unemployed and the elderly without income, and every issue has an order form that solicits annual subscriptions and memberships, surely an unnecessary insertion if only current members and subscribers are intended readers. Indeed, most of petitioner's memberships during its first 2 years originated in this order form.

The newsletter contains a disclaimer to the effect that the views presented are not necessarily those of petitioner. Such a disclaimer is perhaps meaningful when applied to, for example, some of the people quoted in the newsletter. However, given that the newsletter editor is Barrett, who serves as chairman and chief spokesman of petitioner, the disclaimer does not insulate petitioner from the views presented by him in the newsletter. Cf. *Federal Election Commn. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. at 249 (disclaimer in newsletter did not negate contrary fact apparent elsewhere in newsletter).

---

[18] Perhaps fearing the unfavorable implications, petitioner did not respond to a written IRS inquiry about how many staff people are involved in producing the newsletter. Cf. *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947) (presumption that unproduced evidence is unfavorable).

The administrative record contains over 20 monthly issues of petitioner's newsletter. Neither party contends that they are unrepresentative, and we have reviewed them all. We now turn to an examination of how they hold up under the standards of Rev. Proc. 86–43, 1986–2 C.B. 729.[19]

The test contained in the revenue procedure focuses on "the method used by the organization to develop and present its views." *Id.* at 729. Under this test, "The method used by the organization will not be considered educational if it fails to provide a factual foundation for the viewpoint or position being advocated, or if it fails to provide a development from the relevant facts that would materially aid a listener or reader in a learning process." *Id.* at 729–730. In order to provide guidance under this test, the revenue procedure lists four factors relating to the presentations made by the organization, and states that the presence of any of these factors "is indicative that the method used by the organization to advocate its viewpoints or positions is not educational." *Id.* at 730.

The first listed indicator of a noneducational method is that "The presentation of viewpoints or positions unsupported by facts is a significant portion of the organization's communications." *Id.* at 730. Without question, the newsletter does present viewpoints unsupported by facts, as exemplified by the purportedly "common sense" standards advocated for Justices of the Supreme Court, including "No odd or foreign name" and "No beard". Moreover, in its listing of those groups of people who should be excluded from U.S. citizenship, the newsletter includes, with no further explanation, "Boat people, wetbacks and aliens who are incompatible with American nationality and character, such as Nicaraguan refugees or Refusnik immigrants." An additional example is found in the newsletter's "Q&A" section. In response to the question "WHAT IS 'BLACK HISTORY' MONTH

---

[19] In addition to the newsletter, respondent cites Barrett's 1982 book, "The Commission", as evidence that petitioner is not educational within the meaning of sec. 501(c)(3). Petitioner, which did not itself publish the book, distributed only a handful of copies of the book before voluntarily ceasing distribution during the administrative process, apparently in the belief that such distribution was contributing to the view of the IRS that petitioner was operating for Barrett's private, nonexempt purposes. Under these circumstances, the book cannot reasonably be viewed as more than an insubstantial part of petitioner's activities, and its characterization as noneducational would not affect petitioner's status under sec. 501(c)(3). See sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Accordingly, we need not decide the validity of respondent's assertion that the book is noneducational.

ANYHOW?", the newsletter's complete response was as follows:

> No such thing. Nary a wheel, building or useful tool ever emanated from non-white Africa. Africanization aims to set up a tyranny of minorities over Americans.

Although some viewpoints presented in the newsletters are based on purported facts, and the newsletters contain some apparently neutral communications, such as the listing of upcoming events, the above examples, as well as others, demonstrate that a significant portion of the newsletters consists of the presentation of viewpoints unsupported by facts. See also *National Alliance v. United States*, 701 F.2d at 873 ("As the truth of the view asserted becomes less and less demonstrable, * * * 'instruction' or 'education' must, we think, require more than mere assertion and repetition.").

The second factor mentioned as indicative of a noneducational method is that "The facts that purport to support the viewpoints or positions are distorted." Rev. Proc. 86–43, 1986–2 C.B. at 730. As an example of distorted facts, the newsletter in July 1990 stated that the Anti-Defamation League "recently called for Nationalists to be prosecuted and even killed for pamphleteering and exercising free speech." Further on, the article implied that the "killed" reference was an extrapolation by the writer or editor from the quoted phrases "must be stopped" and "pay the price". This type of distortion, however, is presumably less serious than one not apparent on its face. Although such latent distortions may exist in the newsletters, they are not readily apparent from the record. Respondent, for her part, neither emphasizes the distortion factor on brief nor points to specific distorted or erroneous facts. In the totality of these circumstances, we are unable to conclude whether or not the newsletter fails the distortion standard.

The third indicator of a noneducational method is as follows: "The organization's presentations make substantial use of inflammatory and disparaging terms and express conclusions more on the basis of strong emotional feelings than of objective evaluations." *Id.* This practice is prevalent in petitioner's newsletters. For example, petitioner refers to "queers" and "perverts" in the newsletter. In a vocabulary information sheet distributed by petitioner to supporters,

these two words are described as good for "dramatic emphasis" and at least somewhat "caustic".

In addition, the words "invasion" and "invaders" often appear in the newsletter, usually to describe the January 1987 march in Forsyth County, Georgia, and its "black-power" participants. The November 1987 newsletter urged readers to prepare "to purify the ground defiled by the * * * Invaders". Similarly, an audio cassette distributed by petitioner was entitled "We Cleanse This Ground of the Invaders' Stain". Barrett himself was quoted in the January 1988 newsletter as saying: "'Just say no' to the never-ending demands of rioters, looters, burners and invaders". In the same issue and other issues of the newsletter, those resisting the "invaders" were characterized as "patriots" and "martyrs". A "patriot", as defined in petitioner's vocabulary information sheet, is "A lover of his country; a Nationalist".

Based upon these and similar examples, we conclude that petitioner's newsletter comes within the terms of the third of the factors in the revenue procedure that are indicative of a noneducational method.

The fourth and final disqualifying factor is as follows: "The approach used in the organization's presentations is not aimed at developing an understanding on the part of the intended audience or readership because it does not consider their background or training in the subject matter." Rev. Proc. 86–43, 1986–2 C.B. at 730.

The administrative record leaves no doubt that young people are at least a substantial portion of petitioner's intended readership for the newsletter. The average age of petitioner's members, who have an automatic subscription to the newsletter, is in the low twenties. In addition, petitioner's literature refers to young people in glowing terms such as "mainstay" and "seedbed". Direct appeals in the newsletter to young readers include the solicitation of volunteers to work at headquarters or to become Strikers and an occasional short "Inspiration to Youth" segment. In addition to the many references to "youth and workers" and "youth and working people" in the newsletter, other indirect indications that young people are intended readers include articles about activities of students, skinheads, and Strikers, articles about recruitment efforts directed toward skinheads and other

"youth", and articles about the youth-oriented priorities of headquarters personnel.

Petitioner derives much of its ideological impetus from the civil unrest of the 1960s. The newsletter, not surprisingly, often refers to news and events from that period, including legislation such as the Civil Rights Act and the Voting Rights Act. King, whose activities are the subject of so many negative references in the newsletter, was assassinated in 1968. Young readers, by virtue of age alone, might have a somewhat limited "background or training in the subject matter". We conclude that petitioner's newsletter does not educate its readership in the manner required by section 501(c)(3)

Accordingly, petitioner's newsletter is not in furtherance of an educational purpose within the meaning of section 501(c)(3) and section 1.501(c)(3)–1(d)(3), Income Tax Regs. Further, as earlier described, the publication and distribution of the newsletter comprise a substantial part of petitioner's overall activities. We therefore conclude that petitioner fails the operational test of section 1.501(c)(3)–1(c)(1), Income Tax Regs.

## V. *Due Process and Equal Protection*

Finally, again citing the 1st, 5th, and 14th Amendments, petitioner argues that respondent has treated it differently than other organizations similarly situated, thereby violating its due process and equal protection rights. The 14th Amendment provides that no State shall deny to any person the equal protection of the laws. Although the Fifth Amendment, as applicable to the Federal Government, has no equal protection clause, its due process guarantees incorporate similar principles. *Regan v. Taxation with Representation of Wash.*, 461 U.S. at 542 n.2; *Bolling v. Sharpe,* 347 U.S. 497, 499 (1954).

This Court has historically taken a restrained and cautious approach to alleged IRS administrative inconsistency. See *Davis v. Commissioner,* 65 T.C. 1014, 1022–1023 (1976). We do not take possible constitutional violations lightly, however, and we have addressed taxpayer allegations that the IRS violated due process and equal protection guarantees. See, e.g., *Penn-Field Indus., Inc. v. Commissioner,* 74 T.C. 720 (1980); *General Conf. of the Free Church v. Commis-*

*sioner*, 71 T.C. at 931. Here, we can dispense with petitioner's arguments without a detailed venture into constitutional case law. Simply stated, petitioner has failed to show that any similarly situated organization has been treated differently than petitioner. See *Retired Teachers Legal Defense Fund v. Commissioner*, 78 T.C. at 283. Accordingly, petitioner has not established any violation of its due process and equal protection rights.

As detailed in *Nationalist Movement v. Commissioner*, T.C. Memo. 1992–698, petitioner moved to compel discovery relating to these constitutional arguments after the parties had filed the administrative record with the Court. For reasons stated in that opinion, we denied petitioner's motion, thereby precluding the belated factual development that petitioner believed important to support its contention of disparate treatment. Petitioner made another attempt in the form of an appendix attached to its brief, but, as discussed earlier, we have resolved to disregard the appendix materials objected to by respondent. What remains in terms of petitioner's factual foundation is wholly unpersuasive.

Using as a source IRS Publication 78, "Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986", revised to September 30, 1989, petitioner points out that there are many listed organizations whose names begin with words of apparent ethnic, racial, or sexual partiality, such as "Black", "Hispanic", "Jewish", and "Gay". An important disparity, according to petitioner, is the conspicuous absence of "White" organizations, apart from geographical and family names. We are not impressed.

One weakness in petitioner's argument is the unsupported assumption that such "White"-named organizations have even applied for exemption. Moreover, we need look no further than the National Alliance and petitioner itself to see that organizations favoring the white race do not necessarily use the word "White" to begin their names. In any event, a name without more is insufficient for us to decide that any organization is similarly situated to petitioner in terms of its activities or purposes. Petitioner implicitly acknowledges its proof problems by referring on brief to how it "suspects" respondent acts toward other organizations and by referring to what respondent "apparently" or "likely" does.

The administrative record, through petitioner's correspondence with the IRS, does include some published materials apparently distributed by or related to exempt organizations. Petitioner submitted most of these, however, to support specific positions either no longer in dispute or unrelated to the purported educational nature of the material. An exception is a newsletter from an organization with clear conservative leanings, which petitioner asserts fares no better than petitioner's newsletter under educational standards such as those in Rev. Proc. 86–43, *supra*. Even this attempt at proof fails petitioner. A donation solicitation form accompanying the newsletter suggests that an affiliate of the organization, not the organization itself, is tax exempt.

Based upon the foregoing, we sustain respondent's determination that petitioner does not qualify for exemption under section 501(c)(3).

> *An order will be issued granting respondent's motion to strike material from petitioner's rebuttal brief and denying petitioner's motion to supplement the administrative record.*

> *Decision will be entered for respondent.*